**Brenda CURTIS, Plaintiff-Appellant,**

v.

**James R. THOMPSON, et al., Defendants-Appellees.**

No. 86–2921.

United States Court of Appeals, Seventh Circuit.

Argued May 21, 1987.

Decided Feb. 5, 1988.

Rehearing Denied April 12, 1988.

Philip G. Stahl, Isham Lincoln & Beale, Chicago, Ill., for plaintiff-appellant.

Karen Dimond, Asst. State's Atty., Bret A. Rappaport, Asst. Atty. Gen., Chicago, Ill., for defendants-appellees.

Before COFFEY and RIPPLE, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

COFFEY, Circuit Judge.

Plaintiff Brenda Curtis appeals the district court's denial of her motion for a preliminary injunction. Her complaint seeks to enjoin the enforcement of an Illinois statute making it a crime to solicit the sale of residential real estate once the owner has given notice that he or she does not desire to sell the property, Ill.Rev.Stat. Ch. 38 § 70–51(d), as violative of the First Amendment. We affirm.

## I.

The Illinois General Assembly enacted a statute in 1973 prohibiting any individual or corporation from contacting residential property owners for the purpose of persuading them to sell or list their homes after the property owner has given notice to the solicitor that he or she is not interested in selling the property. Ill.Rev.Stat. Ch. 38 § 70–51(d).[1] Subsection (d)(1) of the statute enables the property owner to provide the required notice either personally or through a third party. Individual property owners may also give notice to particular real estate brokers or, as in this case, in the form of a list containing the names of several property owners. *Id.*

The stated purpose of the statute is to prevent so-called "blockbusting" or "panic peddling," *see People v. C. Betts Realtors, Inc.*, 66 Ill.2d 144, 5 Ill.Dec. 258, 260–61, 361 N.E.2d 581, 583–84 (1977) (upholding the constitutionality of § 70–51(d)); that is, the unlawful practice of "solicit[ing] sales of property from white persons on the ground that loss of value will ensue because Negroes have moved ... into a neighborhood...." *Chicago Real Estate*

---

1. Ill.Rev.Stat. Ch. 38 § 70–51(d) provides:
"It shall be unlawful for any person or corporation knowingly:
(d) to solicit any owner of residential property to sell or list such residential property at any time after such person or corporation has notice that such owner does not desire to sell such residential property. For the purpose of this subsection, notice must be provided as follows:
(1) The notice may be given by the owner personally or by a third party in the owner's name, either in the form of an individual notice or a list, provided it complies with this subsection.
(2) Such notice shall be explicit as to whether each owner on the notice seeks to avoid both solicitation for listing and sale, or only for listing, or only for sale, as well as the period of time for which any avoidance is desired. The notice shall be dated and either of the following shall apply:
(A) Each owner shall have signed the notice; or
(B) The person or entity preparing the notice shall provide an accompanying affidavit to the effect that all the names on the notice are, in fact, genuine as to the identity of the persons listed and that such persons have requested not to be solicited as indicated.
(3) The individual notice, or notice in the form of a list with the accompanying affidavit, shall be served personally or by certified or registered mail, return receipt requested."
It is a defense to a criminal charge that actual notice was not given to the alleged solicitor.

*Board v. City of Chicago*, 36 Ill.2d 530, 224 N.E.2d 793, 797 (1967).[2] The Act's title illustrates this purpose: "An Act to Prohibit the Solicitation or Inducement of Sale or Purchase of Real Estate on the Basis of Race, Color, Religion, National Origin, Ancestry, Creed, Handicap, or Sex." Ill.Rev. Stat. Ch. 38 § 70–51. Violations of the statute carry a penalty including either a fine and/or imprisonment, or a combination of both.[3]

Plaintiff-appellant Brenda Curtis, a registered real estate agent, filed this civil rights action pursuant to 42 U.S.C. § 1983, challenging the constitutionality of the Act. Other plaintiffs in this lawsuit (not parties to this appeal) are Alvin T. Pearson, Harold T. Baker, and Mardie Brown, owners and operators of Century 21 Pearson, Inc. Realtors. The defendants are James R. Thompson, the governor of the state of Illinois, Neil F. Hartigan, the Illinois Attorney General, Richard M. Daley, State's Attorney of Cook County, and the Beverly Area Planning Association (BAPA), an Illinois not-for-profit corporation located in Beverly, Illinois.

This lawsuit arose out of BAPA's compilation of a list of some 3,500 Beverly, Illinois, residents who requested that this community organization (BAPA) notify all real estate agents doing business in the township that they did not wish their homes listed for sale with any real estate agencies. These residents, through this affirmative, formal notification to BAPA, were anticipating that the listing of their names on this exempt list would free them from phone calls and/or solicitation by real estate agents. On March 12, 1984, a copy of the BAPA real estate exclusion list was delivered to the plaintiff Alvin Pearson at his Century 21 real estate agency. The plaintiff-appellant Brenda Curtis, an independent real estate agent, did not receive a copy of this list.

According to the complaint on file, BAPA received complaints from a number of Beverly residents who had been solicited by Century 21 after having signified that they did not wish to be called and solicited about listing their residential property for sale. Thereafter, BAPA suggested to the state's attorney's office that it investigate these complaints and any possible statutory violations by Century 21 employees. An investigation followed and revealed that certain "independent contractors working for Century 21" made telephone calls to several Beverly residents whose names appeared on the BAPA list, inquiring if they were interested in listing their homes for sale.[4]

2. "Blockbusting" is defined by the *American Heritage Dictionary* as:
 "the practice of persuading white homeowners to sell quickly and usually at a loss by appealing to the fear that minority groups and especially blacks will move into the neighborhood, with a resulting decline in property values."
 *American Heritage Dictionary*, 2nd College Edition, at page 189.

3. The penalty for a first offense under the statute is imprisonment for up to one year, a fine of up to $1,000, or a combination of both. Ill.Rev. Stat. Ch. 38, §§ 70–52, 1005–8–3(a)(1), 1005–8–1(a)(2). The penalty for a second offense after a conviction is imprisonment for one to three years, a fine of up to $10,000, or a combination of both. *Id.*, §§ 70–52, 1005–8–1(a)(7), 1005–9–1(a)(1). Upon conviction for a single offense, the Department of Registration is also directed to revoke the defendant's certificate of registration as a real estate broker. Ill.Rev.Stat. Ch. 38, § 70–53.

4. Plaintiff's complaint alleges that on June 25, 1984, Brown signed an "Independent Contractor Agreement" with Century 21 and on that date began working from the Century 21 office. Pearson gave Brown a copy of a "reverse directory" of addresses on South Winchester Street in Chicago. (A reverse directory contains the same information as a telephone directory but lists residents' names and telephone numbers in the numerical order of their addresses.) He then instructed Brown to ask the individuals whether they were considering moving in the next two years. If they answered yes, he was to note their name and number for a later communication. If they answered no, he was to ask them if they knew anyone else who might be interested in selling or buying a home. According to the complaint, Pearson did not advise Brown of the existence of the BAPA list, of which Pearson was aware, because Pearson had directed Brown to make telephone calls only to individuals in the Damen area and not to make calls to anyone in Beverly. However, because Brown was unfamiliar with the neighborhood, he did not know that the Damen area ends at 90th Street and the Beverly area begins at 91st Street. Complaint at ¶ 40–45. He therefore placed a number of phone calls to persons on

Subsequently, plaintiffs Pearson, Baker, Brown and the Century 21 agency were charged with criminal violations of the statute.

In her complaint, Curtis alleges that she is a registered real estate broker and would have provided truthful and accurate information to Beverly residents regarding the listing of homes for sale in the area were it not for the existence of the statute and its subsequent enforcement against the other plaintiffs. She submits that because of the state's enforcement of the statute, she has been deprived of the right to offer her services to Beverly residents, including those whose names are *not* listed on the BAPA registry. She maintains that this statute violates her right to free speech under the First Amendment and asks that the state and its agents be enjoined from enforcing it.

On the same day the plaintiffs filed their complaint, March 31, 1986, all the plaintiffs moved for a temporary restraining order and a preliminary injunction and a hearing seeking to enjoin both the pending criminal proceedings against Pearson, Baker and Brown, and the statute's enforcement generally. On April 3, 1986, the district court, after initially determining that an *evidentiary* hearing was unnecessary, held a hearing restricted solely to issues of law. Thus, the defendants did not submit affidavits or other evidence to controvert the allegations contained in plaintiffs' verified complaint. After the hearing, the Court denied plaintiffs' motion for a temporary restraining order but took under advisement their motion for the issuance of a preliminary injunction.

On April 25, 1986, the plaintiffs filed a joint memorandum in support of their motion for a preliminary injunction. The defendants moved to dismiss. No further hearings were held.

Some time later, on October 24, 1986, the district court granted the defendants' motions to dismiss the complaint as to all plaintiffs except Curtis on the ground that the plaintiffs had failed to allege their state court prosecutions were brought in bad faith. Absent such allegations, the court, relying on the abstention doctrine of *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), declined to enjoin those proceedings. The Court stated:

"Except as to plaintiff Brenda Curtis, each of the defendants' motions to dismiss is granted with leave to replead. *Younger v. Harris,* 401 U.S. 37, [91 S.Ct. 746, 27 L.Ed.2d 669] (1971), and *Samuels v. Mackell,* 401 U.S. 66 [91 S.Ct. 764, 27 L.Ed.2d 688] (1971), prevent this court from interfering with a pending state prosecution in the absence of a showing that the prosecution was brought in bad faith. Because the plaintiffs have failed to make a sufficient showing, they cannot avail themselves of this recognized exception to the *Younger* doctrine."

Additionally, the court denied the plaintiffs' motion for a preliminary injunction solely on the ground that they had failed to demonstrate a likelihood of success on the merits. In so ruling, the court addressed only one of the five factors necessary to support preliminary injunctive relief: the likelihood of plaintiff's success on the merits. Curtis individually is the only plaintiff who appeals that portion of the district court's order denying the plaintiff's requested injunctive relief.

## II.

■ As an initial matter, we must determine whether the district court properly denied Curtis' motion for a preliminary injunction without explicitly reciting in its order that it had considered the other four elements Curtis must prove when attempting to establish her right to an injunction. See the test set forth in *Roland Machinery Company v. Dresser Industries,* 749 F.2d 380, 382–88 (7th Cir.1984), and expanded upon in later cases. *E.g., Lawson Products Inc. v. Avnet Inc.,* 782 F.2d 1429, 1432 (7th Cir.1986); *Brunswick Corp. v. Jones,*

the BAPA list. Those individuals "expressed displeasure at Brown's having called them." *Id.* at ¶ 46. Thereafter, on or about June 27 or 28, 1984, at least three of these persons contacted

Julia Girsch, BAPA's Economic Development Coordinator, and advised her that they had been solicited by Brown. *Id.* at ¶ 47.

784 F.2d 271 (7th Cir.1986). Curtis, in establishing her entitlement to a preliminary injunction, bears the burden of demonstrating:

"(1) that [she] has no adequate remedy at law;

(2) that [she] will suffer irreparable harm if the preliminary injunction is not issued;

(3) that the irreparable harm [she] will suffer if the preliminary injunction is not granted is greater than the irreparable harm the defendant will suffer if the injunction is granted;

(4) that [she] has a reasonable likelihood of prevailing on the merits; and

(5) that the injunction will not harm the public interest."

*Brunswick Corporation v. Jones,* 784 F.2d 271, 273–74 (7th Cir.1986).

 The district court's weighing of these factors is a factbound analysis and involves the exercise of discretion. We will reverse the court's decision only where we are convinced that there has been abuse of discretion on the part of the court. *See Lawson Products,* 782 F.2d at 1436–39. Whether the plaintiff can demonstrate a reasonable likelihood of prevailing on the merits often requires a district judge to decide questions of law, as was the case here: the court found that Curtis had no chance of prevailing on the merits since her complaint failed to state a claim under the First Amendment. Therefore, this is not a situation where the probability of plaintiff's success depends on facts that are likely to emerge at trial; the issue of the sufficiency of plaintiff's complaint is solely a question of law. As with all questions of law, we review the legal issue presented *de novo. Thornburgh v. American College of Obstetricians,* 476 U.S. 747, 106 S.Ct. 2169, 2177, 90 L.Ed.2d 779 (1986). Further, "[w]hen the district court's error is the

very predicate of its order, the order must be reversed as an improvident exercise of the court's discretion." *American Can Co. v. Mansukhani,* 742 F.2d 314, 326 (7th Cir.1984). Hence, we undertake an independent review of the district court's legal conclusions in determining whether or not Curtis had any chance of prevailing on the merits. *Brunswick Corp.,* 784 F.2d at 274 n. 2.

 Before doing so, we must determine whether the district court's denial of the injunction without further inquiry into the balance of harms was proper. This circuit employs a "sliding scale" approach in deciding whether to grant or deny preliminary relief; so that even though a plaintiff has less than a 50 percent chance of prevailing on the merits, he may nonetheless be entitled to the injunction if he can demonstrate that the balance of harms would weigh heavily against him if the relief were not granted, *see Illinois Psychological Association v. Falk,* 818 F.2d 1337, 1340 (7th Cir.1987)—still, the "sliding scale" approach is limited by the "likelihood of success" prong of the test. In all cases, the plaintiff must be able to demonstrate at least a "negligible" chance of success to justify injunctive relief. *Brunswick Corp.,* 784 F.2d at 275 ("Although the plaintiff must demonstrate some probability of success on the merits, 'the threshold is low. It is enough that the plaintiff's chances *are better than negligible* ...' ") (quoting *Roland Machinery,* 749 F.2d at 387) (emphasis added). In other words, where the plaintiff is unable to establish this minimum threshold, the harm to the plaintiff will never override his failure to establish a likelihood of success. *See Chicago Board of Realtors,* 819 F.2d 732, 741 (7th Cir.1987).[5] Under circumstances of this nature, the failure of the district court to address factors other than the plaintiff's likelihood of success is not fatal.

---

**5.** At oral argument, counsel for the defendant suggested incorrectly that the preliminary injunction test requires a plaintiff to show a 50 percent or better chance of prevailing on the merits before an injunction may issue. Counsel, however, has failed to cite case law, nor have we found any to substantiate this position. To the contrary, the Seventh Circuit expressly

employs a "sliding scale" approach to deciding whether to grant or deny preliminary relief. *See Illinois Psychological Association v. Falk,* 818 F.2d 1337, 1340 (7th Cir.1987). Our holding today is that a plaintiff must demonstrate a better than negligible chance of success in order to require the district court to consider the remaining factors.

The denial of an injunction based solely upon a plaintiff's failure to establish a negligible chance of success on the merits has been expressly sanctioned by this and other circuits, in cases where the parties do not dispute the district court's balancing of the equitable factors. *See, e.g., Chicago Board of Realtors,* 819 F.2d at 741; *Callaway v. Block,* 763 F.2d 1283, 1287 and n. 6 (11th Cir.1985); *U.P.S. v. United States Postal Service,* 615 F.2d 102, 106–07 (3d Cir.1980); *Noel v. Chapman,* 508 F.2d 1023, 1024–25 (2d Cir.), *cert. denied,* 423 U.S. 824, 96 S.Ct. 37, 46 L.Ed.2d 40 (1975). We refuse to adopt a more lenient rule when the district court determines that the complaint on its face fails to state a cause of action; in either instance, a court of appeals is able to reach the controlling legal issue. *Thornburgh,* 106 S.Ct. at 2177. In this case, were we to hold that a plaintiff's complaint based on the First Amendment is sufficient to establish some likelihood of success on the merits, we might very well feel constrained to remand for a consideration of the remaining elements. But should we agree with the district court that the plaintiff's complaint is insufficient as a matter of law, denial of an injunction on that basis alone is appropriate and proper.

### III.

■ The propriety of the district court's action therefore depends upon whether Curtis' complaint states a claim under the First Amendment. As mentioned previously, she alleges that § 70–51(d) of the Illinois statute violates her First Amendment right to contact homeowners for the purpose of persuading them to sell or list their homes. We initially note that the speech in which Curtis wishes to engage is primarily aimed at proposing a commercial transaction, and should thus be classified as "commercial speech." *Bolger v. Young's Drug Products Corporation,* 463 U.S. 60, 103 S.Ct. 2875, 2879–81, 77 L.Ed.2d 469 (1983). Contrary to earlier holdings of the Supreme Court, our classifying plaintiff's speech as "commercial" speech does not render the First Amendment inapplicable. *See, e.g., Valentine v. Chrestensen,* 316

U.S. 52, 54, 62 S.Ct. 920, 921, 86 L.Ed.2d 1262 (1942) (according commercial speech no First Amendment protection). In modern times the Supreme Court, beginning in 1975 with *Bigelow v. Virginia,* 421 U.S. 809, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975), has extended the protection of the First Amendment to commercial speech.

■ Nevertheless, the high court continues to apply varying levels of scrutiny to restrictions that impact upon protected speech depending upon the nature of the speech and its context. *See, e.g., Cornelius v. NAACP Legal Defense and Educational Fund,* 473 U.S. 788, 105 S.Ct. 3439, 3448–51, 87 L.Ed.2d 567 (1985); *Id.* at 3456–58 (Blackmun, J., dissenting); *United States v. Grace,* 461 U.S. 171, 103 S.Ct. 1702, 1706–07, 75 L.Ed.2d 736 (1983); *Members of City Council of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 104 S.Ct. 2118, 2128–29, 80 L.Ed.2d 772 (1984) (comparing the analysis of viewpoint-specific regulations to the review of viewpoint-neutral regulations); *Clark v. Community for Creative Non-Violence,* 468 U.S. 288, 104 S.Ct. 3065, 3079, 82 L.Ed.2d 221 (Marshall, J., dissenting); *see generally Redish Freedom of Expression,* 87–125 (1984); L. Tribe, *American Constitutional Law* §§ 12–2 to 12–7, § 12–20 (1978). A major theme of these authorities is that the First Amendment does not guarantee citizens the absolute right to engage in every form of speech whenever and wherever the speaker desires. *See City of Watseka v. Illinois Public Action Council,* 796 F.2d 1547, 1561 (7th Cir.1986) (Coffey, J., dissenting); *Greer v. Spock,* 424 U.S. 828, 836, 96 S.Ct. 1211, 1216, 47 L.Ed.2d 505 (1976) (the guarantees of the First Amendment have never meant "that people who want to propagandize protests or views have a constitutional right to do so whenever and however and wherever they please.").

In the area of non-commercial speech, content-based restrictions (such as the one at hand) are sustained only in the most extraordinary circumstances: "[t]he First Amendment forbids the government from regulating speech in ways that favor some

viewpoints or ideas at the expense of others." *Taxpayers for Vincent,* 104 S.Ct. at 2128. This is because such "core" First Amendment speech has always been considered essential to our survival as a democratic society: "[f]ree speech concerning public affairs is more than self-expression; it is the essence of self-government." *Garrison v. Louisiana,* 379 U.S. 64, 74–75, 85 S.Ct. 209, 215–16, 13 L.Ed.2d 125 (1964). By contrast, regulation of commercial speech based upon content is less problematic. Because of the greater potential for deception or invasions of privacy in the context of some advertising methods, content-based restrictions on commercial speech are more often upheld. *Bolger,* 103 S.Ct. at 2879; *Schultz v. Frisby,* 807 F.2d 1339, 1355–72 (7th Cir.1986) (Coffey, J., dissenting), *rehearing en banc granted and decision vacated,* 818 F.2d 1284 (7th Cir. 1987); 619 F.Supp. 792 (E.D.Wis.1985) aff'd by equally divided vote, 822 F.2d 642 (7th Cir.1987), jurisdiction postponed, 108 S.Ct. 692 (1988).

Consequently, the communications Curtis wishes to engage in are entitled to the "qualified, but nonetheless substantial protection accorded to commercial speech." *Bolger,* 103 S.Ct. at 2875. The precise protection available to a particular type of commercial expression "turns on the nature both of the expression and of the governmental interests served by its regulation." *Central Hudson Gas & Electric Corporation v. Public Service Commission of New York,* 447 U.S. 557, 563, 100 S.Ct. 2343, 2350, 65 L.Ed.2d 341 (1980). In *Central Hudson,* the Court adopted this four-part analysis for assessing the validity of a restriction on commercial speech:

> "In commercial speech cases, then, a four-part analysis has developed. At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the

asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest."

100 S.Ct. at 2351. Applying this test, we conclude that § 70–51(d) of the Illinois statute is constitutional as applied to Curtis' proposed speech.

Under the first prong, it is not seriously disputed that Curtis' proposed speech, standing alone, is protected under the First Amendment. As stated above, to pass muster under this prong, it is enough to demonstrate that the speech "concerns lawful activity and is not misleading." *Id.* While the state of Illinois may proscribe what constitutes false, deceptive or misleading sales techniques, *Virginia Pharmacy Board v. Virginia Citizens' Consumer Council Inc.,* 425 U.S. 748, 771–72, 96 S.Ct. 1817, 1830–31, 48 L.Ed.2d 346 (1976), and prohibit commercial speech related to illegal behavior, *Pittsburgh Press Company v. Human Relations Commission,* 413 U.S. 376, 388, 93 S.Ct. 2553, 2560, 37 L.Ed.2d 669 (1973), none of Curtis' actions or proposed activities fall within the parameters of these categories. To the contrary, the free flow of information concerning the purchase and sale of residential real estate properties implicates "one of the most important decisions [citizens] have a right to make: where to live and raise their families." *Linmark Associates, Inc. v. Willingboro,* 431 U.S. 85, 96, 97 S.Ct. 1614, 1620, 52 L.Ed.2d 155 (1977). In our opinion, the subject matter of Curtis' proposed commercial speech, standing alone, is protected under the First Amendment.

Next, we must determine whether the state's admittedly substantial interest in preventing inducements to sell real estate by appealing to the fear of racial integration is directly advanced by § 70–51(d). Curtis argues, and Amicus agrees,[6] that it

---

6. The National Association of Realtors, a not-for-profit professional association for persons engaged in all phases of the real estate business, was granted leave to file an *amicus curiae* brief in support of Curtis' appeal. The Association argues strenuously that § 70–51(d) unjustifiably interferes with the free flow of information about the availability and value of residential

is not directly advanced because the "defendants have produced no evidence that these elicit practices are problems in Illinois or Beverly today. Nor have they offered any evidence on how the statute prevents, or how truthful, non-misleading solicitation causes blockbusting and panic peddling." (Brief of plaintiff-appellant Brenda Curtis, at page 21). Despite the fact that the Illinois Supreme Court has specifically held that the statute directly furthers the goal of preventing "blockbusting," *People v. C. Betts Realtors Inc.*, 66 Ill.2d 144, 151, 5 Ill.Dec. 258, 261, 361 N.E. 2d 581, 584 (1977),[7] They nonetheless maintain it does not in fact achieve this goal. Curtis and Amicus finally note that because the state has enacted a number of laws prohibiting blockbusting directly, the necessity of the further steps taken by the statute are superfluous. *See Virginia Board of Pharmacy*, 425 U.S. at 768, 96 S.Ct. at 1829 ("[t]he strength of [defendant's] proffered justifications is greatly undermined by the fact that high professional standards, to a substantial extent, are guaranteed by the close regulation that pharmacists in Virginia are subject."). Curtis raises an interesting question when she questions whether the regulation does advance the government's interest in a meaningful way to prevent blockbusting, but this argument ignores another overriding interest the state of Illinois argues is served by the statute: the interest in insuring the privacy of the homeowner. In our view, that interest is more than sufficient to justify the limited curtailment of Curtis' right to speak to citizens in their homes.

Admittedly, a homeowner's right to privacy is not the original interest § 70–51(d) was intended to protect. Curtis latches onto this fact and characterizes the state's reliance upon this justification as an "afterthought." Whether it was an afterthought, however, is immaterial, since any

"insufficiency of the original motivation does not diminish other interests that the restriction may now serve." *Bolger*, 103 S.Ct. at 2883. *See also Ohralick v. Ohio State Bar Association*, 436 U.S. 447, 460, 98 S.Ct. 1912, 1921, 56 L.Ed.2d 444 (1978); *F. Doe v. Bolton*, 410 U.S. 179, 190–91, 93 S.Ct. 739, 746–47, 35 L.Ed.2d 201 (1973) (a state may readjust its views and emphases in light of modern knowledge).

Unquestionably, Illinois' interest in ensuring the privacy of its residents while they are at home is strong and valid, even in the face of the First Amendment. The right to privacy sets America apart from totalitarian states in which the interests of the state prevail over individual rights; moreover, the unique importance of the right to privacy *in the home* has, from time immemorial, been amply demonstrated in our constitutional jurisprudence. As early as 1886, the United States Supreme Court recognized that the Fifth Amendment protects against all governmental invasions "of the sanctity of a man's home and the privacies of life." *Boyd v. United States*, 116 U.S. 616, 630, 6 S.Ct. 524, 532, 29 L.Ed. 746 (1886). The First Amendment has been held to encompass the right to "privacy and freedom of association in the home." *Moreno v. United States Dep't of Agriculture*, 345 F.Supp. 310, 314 (D.D.C. 1972), *aff'd*, 413 U.S. 528, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973).

In *Stanley v. Georgia*, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969), the Supreme Court overturned a state conviction for possession of obscene material, holding "that the First and Fourteenth Amendment prohibit making the private possession of obscene material a crime." The Court recited: "For also fundamental is the right to be free, except in very limited circumstances, from unwanted governmental intrusions into one's privacy." *Id.* at 564, 89 S.Ct. at 1247. The *Quilici* dissent, *Quilici v. Vil-*

---

real estate by restricting the brokers' ability to communicate with the public.

7. Both Curtis and the Association criticize *Betts* for its failure to thoroughly analyze whether § 70–51(d) was drawn narrowly enough to achieve its stated purpose without unduly restricting the First Amendment rights of realtors.

Although *Betts* did summarily conclude, on the basis of the parties' agreement, that "the primary purpose of the Act is to prevent 'blockbusting' or 'panic peddling,'" 5 Ill.Dec. at 260–61, 361 N.E.2d at 583–84, the bulk of the court's opinion rests on the privacy issue.

*lage of Morton Grove*, 695 F.2d 261, 279 (7th Cir.1982) (Coffey, J., dissenting), explains *Stanley*'s recognition of the right to privacy in the home as fundamental to this nation's concept of ordered liberty:

"The Court has made it clear that its *Stanley* decision was not based on the idea that obscene matter is itself protected under the right of privacy. Rather, the focus in *Stanley* was on the fact that the activity prohibited by the Georgia statute occurred in the privacy of the home. In *United States v. Reidel*, 402 U.S. 351, 356, 91 S.Ct. 1410, 1412, 28 L.Ed.2d 813 (1971), the Court rejected the argument that commercial distribution of pornography is constitutionally protected and held that the 'focus' of Stanley was 'on freedom of mind and thought and on the privacy of one's home.' Subsequently, the Court in *United States v. Orito*, 413 U.S. 139, 142, 93 S.Ct. 2674, 2677, 37 L.Ed.2d 513 (1973) stated 'the Constitution extends special safeguards to the privacy of the home' and there exists a 'myriad' of activities which may be prohibited in public but which may be lawfully conducted within the privacy and confines of the home.

Most importantly, the Supreme Court in *Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 66, 93 S.Ct. 2628 [2640,] 37 L.Ed.2d 446 (1973), held that *Stanley* was decided 'on the narrow basis of the "privacy of the home" which was hardly more than a reaffirmation that *"a man's home is his castle."* ' (emphasis added)."

695 F.2d at 279–80. Justice Black's concurrence to *Gregory v. City of Chicago*, 394 U.S. 111, 125, 89 S.Ct. 946, 953–54, 22 L.Ed. 2d 134 (1969) also highlights the importance of privacy in our society:

"Were the authority of government so trifling as to permit anyone with a complaint to have asked power to do any-thing he pleased, wherever he pleased, and whenever he pleased, our customs and our habits of conduct, social, political, economic, ethical and religious, would all be wiped out, and become no more than relics of a gone but not forgotten past. Churches would be compelled to welcome into their buildings invaders who came but to scoff and jeer; streets and highways and public buildings would cease to be available for the purpose for which they were constructed and dedicated whenever demonstrators and picketers wanted to use them for their own purposes. *And perhaps worse than all other changes, homes, the sacred retreat to which families repair for their privacy and daily way of living, would have to have their doors thrown open to all who desire to convert the occupants to a new view, new morals and a new way of life.*"

(Emphasis added). *See also Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); *Poe v. Ullman*, 367 U.S. 497, 551–52, 81 S.Ct. 1752, 1781–82, 6 L.Ed.2d 989 (1961) (Douglas, J., dissenting). When the fundamental right to privacy clashes with the right of free expression, the interest in privacy does not play second fiddle when the speech is merely intended to propose a commercial transaction.[8] For instance, in *Kovacs v. Cooper*, 336 U.S. 77, 81, 69 S.Ct. 448, 450, 93 L.Ed. 513 (1949), the Supreme Court upheld an ordinance which prohibited the use of sound trucks on residential streets. The court explained that the interest in preventing interference with the activities of residents "or the quiet they would like to enjoy" was sufficient to justify the ordinance involved.

Likewise, in *Rowan v. United States Post Office Department*, 397 U.S. 728, 736, 90 S.Ct. 1484, 1490, 25 L.Ed.2d 736 (1970), a case almost directly on point, the Supreme

---

**8.** For instance, the state's interest in regulating expressive conduct is even greater where the expressive conduct threatens to (or does) impinge on the exercise of equally important constitutional rights (e.g., privacy) of others:

"Although American constitutional jurisprudence, in light of the First Amendment, has been zealous to preserve access to public places for purposes of freedom of speech, the nature of the forum and the conflicting interests involved have remained important in determining the degree of protection afforded by the Amendment to the speech in question." *Lehman v. City of Shaker Heights*, 418 U.S. 298, 302–03, 94 S.Ct. 2714, 2716–17, 41 L.Ed.2d 770 (1974).

Court upheld as constitutional the federal statute that empowers the post office, upon request of an individual, to require that a sender of unsolicited mail remove the name and address of the individual from its mail lists. *See* 39 U.S.C. § 3008. The statute upheld in *Rowan* provides a procedure whereby any householder may insulate himself from advertisements that offer for sale "matter which the addressee in his sole discretion believes to be erotically arousing or sexually provocative." 39 U.S. C. § 3008(a) (1964). Thus, under *Rowan*, the individual is able to stop the delivery of what he believes to be sexually provocative material to his private residence without interfering with the mailer's general right to disseminate its materials to "willing" recipients. The Court, citing *Martin v. City of Struthers*, 319 U.S. 141, 63 S.Ct. 862, 87 L.Ed.2d 1313 (1943), recognized "the very basic right to be free from sights, sounds, and tangible matter" in the privacy of our homes:

"... Mr. Justice Black, for the Court, while supporting the '[f]reedom to distribute information to every citizen,' ... acknowledged a limitation in terms of leaving 'with the homeowner himself' the power to decide 'whether distributors of literature may lawfully call at a home.' ... Weighing the highly important right to communicate, but without trying to determine where it fits into constitutional imperatives, against the very basic right to be free from sights, sounds and tangible matter we do not want, it seems to us that a mailer's right to communicate must stop at the mailbox of an unreceptive addressee.

The Court has traditionally respected the right of a householder to bar, by order or notice, solicitors, hawkers, and peddlers from his property.... *In this case the mailer's right to communicate is circumscribed only by an affirmative act of the addressee giving notice that he wishes no further mailings from that mailer."*

90 S.Ct. at 1490 (citations omitted) (emphasis added). As in *Rowan*, the Illinois statute in this case circumscribes the mailer's right to communicate only by the address-ee's taking affirmative action in giving notice to the mailer that he wishes no further mailings from his enterprise. The fact that the federal statute approved in *Rowan* involved sexually explicit materials, while the state statute involves solicitation to sell real estate, does not render *Rowan*'s conclusion inapplicable:

"Both the absoluteness of the citizen's right under § 4009 and its finality are essential; what may not be provocative to one person may well be to another. *In operative effect the power of the householder under the statute is unlimited; he may prohibit the mailing of a dry goods catalog because he objects to the contents* —or indeed the text of the language touting the merchandise. Congress provided this sweeping power not only to protect privacy but to avoid possible constitutional questions that might arise from vesting the power to make any discretionary evaluation of the material in a governmental official.

In effect, Congress has erected a wall —or more accurately permits a citizen to erect a wall—that no advertiser may penetrate without his acquiescence. The continuing operative effect of a mailing ban once imposed presents no constitutional obstacles; the citizen cannot be put to the burden of determining on repeated occasions whether the offending mailer has altered its material so as to make it acceptable. Nor should the householder have to risk that offensive material come into the hands of his children before it can be stopped."

*Id.* at 1491 (emphasis added).

The similarity of the instant case to *Rowan* makes out a powerful argument in favor of upholding the constitutionality of the Illinois statute. In both situations, the right of privacy in the home must override the mailer's right to communicate once the homeowner notifies that particular mailer that he wishes no further mailings. Further, the continued vitality of the *Rowan* decision has been reaffirmed by the Supreme Court as recently as 1983. *See Bolger*, 103 S.Ct. 2875, 2883 n. 25 (1983). Again, quoting Justice Black in *Gregory:*

"No mandate in our Constitution leaves states and governmental units powerless to pass laws to protect the public from the kind of boisterous, threatening conduct *that disturbs the tranquility of spots selected by the people either for homes, wherein they can escape the hurly-burly of the outside business and political world,* or for public and other buildings that require peace and quiet to carry out their functions, such as courts, libraries and hospitals."

394 U.S. at 118, 89 S.Ct. at 950 (emphasis added). Finally, as was explained in *Schultz v. Frisby,* 807 F.2d at 1359 (Coffey, J., dissenting):

"As important as free speech is to preserving our freedom, the right of privacy which ensures the opportunity for peace, tranquility, comfort, and personal solace away from the often overwhelming bombardment of unsolicited communications from political, commercial, and religious groups, enterprises, and organizations cannot be any less important in a society whose existence depends on the ability of each individual (as well as the majority) to conscientiously exercise his or her judgment in the conduct of their own affairs and those of their locality and nation. The conscientious exercise of judgment upon which we depend can hardly be exercised in the absence of the privacy necessary for contemplation and reflection. To hold that the right of free speech outweighs all other individual rights ... goes far beyond the boundaries the Supreme Court has established when considering the limitations on the right of free speech. The ... unwarranted expansion of the right to freedom of speech under the First Amendment leaves a foundation for transforming the right of free speech from a tool of freedom and democracy into a weapon of injustice."

Contrary to Curtis' argument, the regulation in issue meets the *Central Hudson* test because it directly advances the goal of ensuring privacy in the home. As was the case in *Rowan,* once a homeowner expresses his or her desire not to receive certain types of literature he or she determines to be objectionable, there simply is no further right to press those ideas on the unwilling recipient: [9]

"We therefore categorically reject the argument that a vendor has a right under the Constitution or otherwise to send unwanted material into the home of another. If this prohibition operates to impede the flow of even valid ideas, the answer is that no one has a right to press even 'good' ideas on an unwilling recipient. That we are often 'captives' outside the sanctuary of the home and subject to objectionable speech and other sound does not mean we must be captives everywhere.... *The asserted right of a mailer, we repeat, stops at the outer boundary of every person's domain.*"

90 S.Ct. at 1491 (emphasis added).

Curtis responds that the statute is underinclusive because it does not prohibit forms of mail other than real estate solicitations

**9.** Many of the cases cited by Curtis, which strike down blanket restrictions on certain types of commercial speech, are distinguishable for the reason that the recipient in those cases had not previously expressed the desire to be shielded from the particular communication. Moreover, many of the cases do not involve communications impacting on a homeowner's right to privacy. For instance, in *Linmark Associates Inc. v. Township of Willingboro,* 431 U.S. 85, 97 S.Ct. 1614, 52 L.Ed.2d 155 (1977), the Court invalidated a township ordinance prohibiting the posting of "for sale" and "sold" signs on residential property. Although the statute's purpose was to stem what the township perceived as the flight of white homeowners from a racially integrated community, the Court found insufficient proof to establish that a sign ban would alleviate the problem without unduly restricting the flow of truthful commercial information. 97 S.Ct. at 1618–21. That case, however, did not involve a statute aimed at protecting a homeowner's privacy, nor were the communications directed to persons who had previously expressed a desire to be left alone. It is also on this basis that Curtis' citations to *Zauderer v. Office of Disciplinary Council,* 471 U.S. 626, 105 S.Ct. 2265, 85 L.Ed.2d 652 (1985) (Supreme Court invalidated an Ohio disciplinary rule which prohibited lawyers from soliciting business through the use of truthful advertisements), and *Coldwell Banker v. Clayton,* 105 Ill.2d 389, 86 Ill.Dec. 322, 475 N.E. 2d 536 (1985) (Illinois Supreme Court struck down statute prohibiting real estate brokers from offering inducements to potential clients) are unpersuasive.

from entering the home. Mere underinclusiveness does not, however, amount to constitutional infirmity. As explained previously, a restriction on commercial speech may well be valid where it "directly advances the governmental interest asserted, and ... is not more *extensive* than is necessary to serve that interest." *Central Hudson,* 100 S.Ct. at 2351. While the Illinois statute could have been *more* extensive, the state's decision to limit the scope of the statute does not translate into a constitutional problem[10]:

> "For the Legislature absolutely and conditionally to forbid public speaking in a highway or public park is no more an infringement of the rights of a member of the public than for the owner of a private house to forbid it in his house. When no proprietary right interferes, the Legislature may end the right of the public to enter upon the public place by putting an end to the dedication to public uses. *So it may take the less step of limiting the public use to certain purposes.*"

*Davis v. Massachusetts,* 167 U.S. 43, 47, 17 S.Ct. 731, 733, 42 L.Ed. 71 (1897) (emphasis added). Essentially, Curtis' contention that the statute is under-inclusive asks us to second-guess the Illinois General Assembly and hold the statute unconstitutional merely because we may believe that Illinois could have prohibited more expressive conduct in an effort to achieve its stated purposes. But "[e]ven on matters touching the First Amendment, courts must accept plausible judgments by other governmental actors." *American Jewish Congress v. City of Chicago,* 827 F.2d 120, 130 (7th Cir.1987) (Easterbrook, J., dissenting). *See also Turner v. Safley,* — U.S. —, 107 S.Ct. 2254, 2264–65 n. **, 96 L.Ed.2d 64 (1987); *Munro v. Socialist Workers Party,* — U.S. —, 107 S.Ct. 533, 537–38, 93 L.Ed.2d 499 (1986).[11]

It is axiomatic that state governmental entities are vested with the responsibility of enacting laws for the protection of the public under its police powers. *Schultz v. Frisby,* 807 F.2d at 1360 (Coffey, J., dissenting). As the United States Supreme Court explained: "state legislatures have constitutional authority to experiment with new techniques; they are entitled to their own standard of the public welfare ..." *Day-Brite Lighting v. Missouri,* 342 U.S. 421, 423, 72 S.Ct. 405, 407, 96 L.Ed. 469 (1952). Therefore, especially when factual issues determine the constitutionality of

---

**10.** Curtis' argument can be viewed as the flip side of the "narrowly tailored test" a time, place, or manner regulation on speech must meet. Under that test, a statute is narrowly tailored if it "[does] no more than eliminate the exact source of the evil it sought to remedy ..." *Taxpayers for Vincent,* 104 S.Ct. at 2131. *See also City of Watseka,* 796 F.2d at 1562–67 (Coffey, J., dissenting) (discussing the difference between the "narrowly tailored test" and the "less-restrictive-mean" analysis under the overbreadth doctrine). In this case, § 70–51(d) meets this test since it only prohibits solicitation once the property owner has given notice he does not wish to sell his property. But Curtis argues, in effect, that the statute is *too narrowly* tailored since a broader prohibition could have achieved the goal of insuring privacy. As explained in this opinion, a statute that directly advances the desired goal is not invalid merely because it could have been drafted in a more expansive fashion. In this case, the narrowness of the statute is the result of its attempt to achieve its primary purpose of preventing blockbusting. But the privacy interests now directly and narrowly served by § 70–51(d) operate to justify the very limited infringement upon the First Amendment rights of sellers of real estate.

**11.** The dissent states that further development of the record is necessary to determine if there exists "a sufficiently tight 'fit' between the legislature's ends [securing the privacy of its citizens] and the means chosen to accomplish those ends [the banning of real estate solicitations when a homeowner affirmatively expresses to the solicitor his or her desire to be left alone]." But if the state's decision as to where to draw the line between ends and means is reasonable, a court may not use its own findings to upset a plausible state decision. *Vance,* 440 U.S. at 110–12, 99 S.Ct. at 949–50. As we point out in the text of the opinion, Illinois' decision in this case is reasonable in light of *Rowan'* s central holding—that a state may "permit people to insulate themselves from categories of speech ... [if] the government ... leave[s] the decision about what items are forbidden in the hands of the potentially offended recipients" *American Booksellers Ass'n v. Hudnut,* 771 F.2d 323, 333 (7th Cir. 1985). Returning this case to the district court for further development of the record is not only unnecessary, but it may very well serve to give the wrong signal to the trial court to substitute its judgment for that of the duly elected representatives of the citizens of Illinois, the Illinois legislature.

governmental action, a federal court may not use its own findings to upset plausible state decisions. *Vance v. Bradley*, 440 U.S. 93, 110–12, 99 S.Ct. 939, 949–50, 59 L.Ed.2d 171 (1979). Illinois' decision to limit the reach of § 70–51(d) falls well within that realm of plausible judgment.

Our holding today is narrow: once a homeowner gives notice to a person that he or she does not desire to have the home listed for sale and that he or she does not desire to be contacted by real estate brokers who have previously been made aware of the decision, the right of a homeowner to decide what he or she will or will not hear, under the right to privacy, plainly outweighs the right of a real estate broker to continue to contact that person in his or her home.[12] Once actual notice is received by a real estate agent, that agent is barred from contacting the homeowner for the purpose of persuading him or her to list the residence for sale. Our holding prevents neither a buyer nor a seller of real estate from contacting any person who has not notified the particular broker that he wishes to be left undisturbed.

One final note merits attention. Courts, as contrasted with legislatures, are far removed from the daily problems facing our elected representatives; we are cognizant of the fact that we must confine our analysis to the First Amendment constitutional question presented herein as to whether the statute reasonably accommodates the right of the speaker to reach willing audience members, the rights of the willing audience to receive the message, and the rights of the unwilling audience to their personal privacy. This case also illustrates the care that must be taken to accord the various branches of government their proper roles in our system of "checks and balances." The constitutions of the United States and the respective states define and delineate the authority, jurisdiction and powers of our various governmental units. As a fundamental principle, if a governing body (federal, state or local) should at any time overstep its limits, the judiciary must act as a constitutional check. This was the intent of the framers of the Constitution as evidenced by their dividing and separating the powers and responsibilities of each unit into three separate and distinct branches. Specifically, if a legislative body enacts a law exceeding the constitutional limits of its authority, it is the responsibility and the duty of an independent judiciary to rule on the same. On the other hand, in the absence of a constitutional violation, determining where to strike the balance between the competing interests is more properly a matter for the legislature, not for the Court. The Constitution wisely vests that branch of the government with the power and authority of law making, for the legislature is better equipped to carry out that task in that interested parties, such as state and local governmental representatives, homeowners, real estate brokers, etc., are able to present their respective positions before the legislative body in a more open, unrestricted, informal forum. Thereafter, the myriad of questions and problems, as well as their possible solutions, are brought before the entire legislative branch of government and are subject to the scrutiny of public hearings and debates. When dealing with the complex and

---

**12.** Curtis additionally maintains that § 70–51(d) is unconstitutionally vague under the due process clause of the Fourteenth Amendment since the word "solicitation" as it is used in the statute insufficiently informs the citizenry what conduct is prohibited. The argument is not convincing. "A statute is fatally vague only when it exposes a potential actor to some risk or detriment without giving him fair warning of the nature of the proscribed conduct." *Rowan*, 397 U.S. at 740, 90 S.Ct. at 1492. In this case appellant knows precisely what she must refrain from doing on receipt of statutory notice. The complainants' names must be removed from any mailing list the broker may have, and the broker must refrain from future communications to the named addressees. Appellant runs no substantial risk of miscalculation. Further, at least one Illinois court has explained the meaning of "solicitation" for the purposes of § 70–51(d), *see People v. Beaulieu Realtors Inc.*, 144 Ill.App.3d 580, 98 Ill.Dec. 382, 385, 494 N.E.2d 504, 507 (1986); its meaning in this context is sufficiently clear to satisfy due process. Similarly, Curtis' claim that the statute violates equal protection because it has no rational basis is without merit. Our holding that the provision directly advances the state's interest in ensuring the privacy of homeowners forecloses Curtis' equal protection challenge.

everchanging question of an individual's rights under the First Amendment, as contrasted with those of society as a whole and/or a governmental agency, whether it be a municipal, county, state or federal governmental entity, the fact-finding and policy making capabilities of a court of law are far more limited and confined due to the very being of a court law, enshrined with its technical rules of evidence as to admissibility and materiality that often serve to limit a court's ability to make a clear, definitive, and thus reasoned pronouncement on matters of public policy.

Consequently, a truly independent judiciary must always exercise its powers of review and decision making with discretion and reservation, giving due deference to the other branches of government. Our judicial responsibility obligates us to declare an act by another governmental unit to be void if we believe the enacted law is contrary to the principles of the Constitution. After reviewing Ill.Rev.Stat. Ch. 38 § 70–51(d), we are convinced that the expressed will of the people as enacted in the Illinois statute is not contrary to the principles of the Constitution, we should not, and will not, interfere with this judgment of the legislature, a coequal branch of government.

This excerpt from *Martin v. City of Struthers,* 319 U.S. 141, 63 S.Ct. 862, 87 L.Ed. 1313 (1943) is particularly apt:

"A city can punish those who call at a home in defiance of the previously expressed will of the occupant and, in addition, can by identification devices control the abuse of the privilege by criminals posing as canvassers. In any case, the problem must be worked out by each community for itself with due respect for the constitutional rights of those desiring to distribute literature and those desiring to receive it, as well as those who choose to exclude such distributors from the home."

319 U.S. at 148–49, 63 S.Ct. at 866.

We hold that the district court properly denied plaintiff's motion for a preliminary injunction based upon her failure to establish a reasonable likelihood of prevailing on the merits. Curtis' First Amendment right to engage in commercial speech is properly limited by the state's legitimate interest in ensuring the privacy of its citizens, an interest which is narrowly served by prohibiting the solicitation of residential property owners once they have expressed their desire to be left alone. The decision of the district court is AFFIRMED.

ESCHBACH, Senior Circuit Judge, concurring.

Although I concur in the result reached by the court, I write separately to make two points. First, although I believe that the holding in *Rowan v. United States Post Office Department,* 397 U.S. 728, 90 S.Ct. 1484, 25 L.Ed.2d 736 (1970) is relevant here and much of its analysis helpful, I do not find it dispositive. Careful examination of the analysis in *Rowan* reveals that its holding was founded on the implied but obvious determination that the federal statute at issue there was content neutral in that it involved no "... discretionary evaluation of the material [by] a governmental official." The Illinois statute at issue in the present case cannot be construed as content neutral because it clearly proscribes one type of communication (real estate solicitations) and mandates criminal penalties for violation of that proscription. For that reason I believe *Rowan* to be distinguishable from this case.

I must also point out that while I neither agree nor disagree with the observations set forth in the final four pages of the majority opinion pertaining to the subjects of judicial restraint and the proper role of the federal judiciary, I do not believe those views are necessary to the proper disposition of this case. Therefore, I expressly decline to join in them.

RIPPLE, Circuit Judge, dissenting.

The opinions of my brothers manifest that they have given much careful thought to the disposition of this case and it is with great reluctance that I must decline to join them. However, appellate courts, no matter how hard they try to fashion a comprehensive and integrated workproduct, are

bound by the record that has been made in the trial court. Here, the truncated methodology employed by the district court has left us with an inadequate basis for resolution of the issues before us. Accordingly, I would remand this case to the district court for further development of the record.

The grant or denial of a preliminary injunction is, of course, a matter committed to the sound discretion of the trial judge. That decision ought to be disturbed only when there has been an abuse of discretion. *See Lawson Prods. v. Avnet, Inc.,* 782 F.2d 1429, 1436–39 (7th Cir.1986). However, the use of such a deferential standard of review by the appellate court presumes that the district court has employed the appropriate judicial methodology and that the decision to grant or deny the preliminary injunction is the product of a considered evaluation of the criteria contained in that methodology.

The appropriate judicial methodology for considering a request for a preliminary injunction has been set forth in numerous opinions of this court. *See, e.g., Brunswick Corp. v. Jones,* 784 F.2d 271, 273–74 (7th Cir.1986); *Lawson Prods.,* 782 F.2d at 1432; *American Hosp. Supply Corp. v. Hospital Prods.,* 780 F.2d 589, 593 (7th Cir.1985); *Roland Mach. Co. v. Dresser Indus.,* 749 F.2d 380, 382–83 (7th Cir.1984). The majority opinion has summarized those steps quite succinctly:

> Curtis, in establishing her entitlement to a preliminary injunction, bears the burden of demonstrating:
>
> "(1) that she has no adequate remedy at law;
>
> (2) that she will suffer irreparable harm if the preliminary injunction is not issued;
>
> (3) that the irreparable harm she will suffer if the preliminary injunction is not granted is greater than the irreparable harm the defendant will suffer if the injunction is granted;
>
> (4) that she has a reasonable likelihood of prevailing on the merits; and
>
> (5) that the injunction will not harm the public interest."

*Brunswick Corporation v. Jones,* 784 F.2d 271, 273–74 (7th Cir.1986).

In this case, the district court addressed only one of the five factors. It denied the plaintiffs' motion for a preliminary injunction because, in the district court's view, they had failed to demonstrate a likelihood of success on the merits. Moreover, the district court reached this conclusion without holding, despite the request of the parties, an evidentiary hearing. As reflected in its one-page minute order—only one paragraph of which is devoted to Ms. Curtis' case—the district court was of the view that the decision of the Supreme Court of the United States in *Rowan v. Post Office Dept.,* 397 U.S. 728, 90 S.Ct. 1484, 25 L.Ed. 2d 736 (1970), and the decision of the Illinois Supreme Court in *People v. C. Betts Realtors,* 66 Ill.2d 144, 5 Ill.Dec. 258, 361 N.E.2d 581 (1977), were "authoritative" and "necessitate denial of the motion for preliminary injunction." I respectfully suggest that such a truncated treatment of Ms. Curtis' case was inappropriate.

An evaluation of the merits of Ms. Curtis' case must begin with the basic reality that it involves rights of freedom of expression protected by the first amendment— commercial speech, but speech nonetheless. As the majority opinion correctly points out, commercial speech may be regulated in a manner quite different from other forms of speech. As my brothers also point out, in *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n,* 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980), the Supreme Court set forth a four-step analysis for assessing the validity of a restriction on commercial speech:

> In commercial speech cases, then, a four-part analysis has developed. At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it

is not more extensive than is necessary to serve that interest.

*Id.* at 566, 100 S.Ct. at 2351.

There is no real dispute with respect to the first prong of this test. Information about the state of the local real estate market concerns lawful activity. The second prong is also not troublesome. There is a substantial governmental interest in preventing discrimination in housing. There is also a substantial governmental interest in protecting a person's legitimate expectation of privacy in the home. The next two prongs of the *Central Hudson* test are somewhat more difficult and, in my view, deserve a more comprehensive analysis than that given them by the district court or the majority. On this record, it is not established that the statute directly advances either of these governmental interests. As the majority notes, the record contains no evidence that the problem of blockbusting exists in Illinois or in Beverly today. Nor does the record contain any evidence as to how a curb on the truthful, non-misleading communication by a member of the real estate profession will advance directly the government's attempt to end such racially discriminatory practices. *Cf. Linmark Assocs. v. Willingboro,* 431 U.S. 85, 95, 97 S.Ct. 1614, 1619, 52 L.Ed.2d 155 (1977) (noting that the record failed to establish that "this ordinance is needed to assure that Willingboro remains an integrated community" (footnote omitted)).

The majority correctly notes that the government may assert in defense of the statute an interest other than that which prompted the original enactment of the statute. *See Bolger v. Youngs Drug Prods.,* 463 U.S. 60, 71, 103 S.Ct. 2875, 2883, 77 L.Ed.2d 469 (1983); *Ohralik v. Ohio State Bar Ass'n,* 436 U.S. 447, 460, 98 S.Ct. 1912, 1921, 56 L.Ed.2d 444 (1978); *Doe v. Bolton,* 410 U.S. 179, 190–91, 93 S.Ct. 739, 746–47, 35 L.Ed.2d 201 (1973). The state certainly does have a strong interest in ensuring the privacy of the home. Yet, again, there is no record to support the proposition that this statute directly protects that interest. We do not know, on this record, the extent of real estate solici-

tation activity. Moreover, while the under-inclusiveness of the statute certainly does not doom it under this prong, see *Posadas de Puerto Rico Assocs. v. Tourism Co.,* 478 U.S. 328, 106 S.Ct. 2968, 2977–78, 92 L.Ed.2d 266 (1986), we cannot ignore, at this very early stage in the development of the record, that, if Illinois meant to protect the privacy of the home from commercial intrusion, it apparently chose a rather feeble approach. There is nothing in the record to support the conclusion that real estate solicitation is any more a threat to the privacy of the home than other forms of commercial intrusions. *See id.* at 2978 and n. 8.

The last prong of the *Central Hudson* test presents a particularly troubling problem on this record. That prong requires that the restriction on commercial speech be "not more extensive than is necessary to serve that interest." 447 U.S. at 566, 100 S.Ct. at 2351. Certainly, the language of the statute (and no narrowing construction has been suggested, see *Posadas,* 106 S.Ct. at 2975–76) is very broad. It prevents—apparently—all real estate solicitation at any place (not just the home) at any time by anyone. *See generally People v. Beaulieu Realtors,* 144 Ill.App.3d 580, 98 Ill.Dec. 382, 386, 494 N.E.2d 504, 508 (1986).

It may be that further development of the record would establish a sufficiently tight "fit" between the legislature's ends and the means chosen to accomplish those ends. However, the record before us hardly allows us to reach that conclusion. At this stage in the litigation, therefore, we must conclude that "'the plaintiff's chances are better than negligible....'" *Brunswick,* 784 F.2d at 275 (quoting *Omega Satellite Prods. v. City of Indianapolis,* 694 F.2d 119, 123 (7th Cir.1982)).

It is also suggested that any infirmity with respect to the "fit" created by the Illinois statute is neutralized by the fact that, as in the case of the statute at issue in *Rowan v. Post Office Dept.,* 397 U.S. 728, 90 S.Ct. 1484, 25 L.Ed.2d 736 (1970), this statute permits the exclusion of the material only when the intended recipient

declares a desire not to receive the material. *Rowan* does provide some support for the constitutionality of this Illinois statute. The case "shows that a state may permit people to insulate themselves from categories of speech ... but the government must leave the decision about what items are forbidden in the hands of the potentially offended recipients." *American Booksellers Ass'n. v. Hudnut*, 771 F.2d 323, 333 (7th Cir.1985). However, as Judge Eschbach has cogently noted, the Illinois statute is not on "all fours" with the statute at issue in *Rowan*, 39 U.S.C. § 3008. In *Rowan*, the Supreme Court specifically noted that the recipient could designate *any* material as offensive. With respect to that designation—no matter how broad it might be—the recipient would receive the protection of the statute. The absolute right of the recipient under *Rowan* to refuse any mail was again stressed in *Bolger:*

> Title 39 U.S.C. § 3008, a prohibition of "pandering advertisements," permits any householder to insulate himself from advertisements that offer for sale "matter which the addressee in his sole discretion believes to be erotically arousing or sexually provocative." § 3008(a). The addressee's rights are absolute and "unlimited; he may prohibit the mailing of a dry goods catalog because he objects to the contents—or indeed the text of the language touting the merchandise." *Rowan*, 397 U.S., at 737, 90 S.Ct. at 1491.

463 U.S. at 72 n. 25, 103 S.Ct. at 2883 n. 25. On the other hand, here, the statute places significant restrictions on the recipient's ability to preclude material. Only solicitations with respect to residential realty are covered. Moreover, while under *Rowan* the recipient could bar mail communications *at his address*, under the Illinois statute the recipient may apparently bar any message directed to him anywhere. Reliance on *Rowan* is therefore not a sufficient basis to justify the district court's failure to address, in preliminary fashion, all of the criteria governing a motion for a preliminary injunction.

In sum, the merits of the plaintiff's constitutional argument must, at this very preliminary state of the litigation, be charac-terized as "better than negligible." *Brunswick*, 784 F.2d at 275. It was not, therefore, appropriate for the district court to deny the motion for a preliminary injunction without addressing each of the criteria set forth in *Brunswick*. We must, despite the level of present caseloads, resist the temptation to short-cut well-established analytical patterns in complex cases. This judicial discipline is especially important in the constitutional case where the ultimate values of our society are affected incrementally by every stroke of our pen. Accordingly, I would reverse the judgment of the district court and remand the case for further development of the record.