**SHENANDOAH VALLEY POULTRY COMPANY, INC.,**
Plaintiff–Appellant,

v.

**ARMOUR AND COMPANY,**
Defendant–Appellee.

No. 87–2964.

United States Court of Appeals,
Seventh Circuit.

Argued April 22, 1988.

Decided Aug. 10, 1988.

Marilyn R. Ratliff, Kahn, Dees, Donovan & Kahn, Evansville, Ind., for plaintiff-appellant.

Robert H. Hahn, Bamberger, Foreman, Oswald & Hahn, Evansville, Ind., for defendant-appellee.

Before WOOD, Jr. and POSNER, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

ESCHBACH, Senior Circuit Judge.

Appellant Shenandoah Valley Poultry Company ("Shenandoah") appeals from the district court's entry of judgment for Armour and Company ("Armour") following a bench trial in this diversity matter.

## I

The parties' dispute arose out of the circumstances surrounding Shenandoah's November 1982 purchase from Armour of a turkey hatchery located in Patoka, Indiana and a turkey processing plant and related facilities in the Washington, Indiana area. In late 1981, Armour made the decision to sell all of its turkey producing facilities nationwide. It retained a former employee, Donald Wharton, to coordinate the sale of those facilities. Around the same time, Douglas Gregory was hired as General Manager of Armour's entire Indiana turkey raising and processing operation. Gregory had been made General Manager for the purpose of improving the efficiency of the overall operation and to prepare it for sale. After Shenandoah's initial inquiry in June 1982, Gregory was explicitly instructed by Armour not to become involved in the negotiations between Armour and Shenandoah. He and Armour had agreed that his employment with Armour would terminate when the Indiana facilities were sold.

On August 12 and 13, 1982, Shenandoah and Armour reached a tentative agreement that Shenandoah would purchase the Indiana operations. A Poultry Plant Net Assets Purchase Agreement (the "Purchase Agreement") was signed by the parties on October 8, 1982 and the purchase was closed on November 8 and 9, 1982.

Shenandoah took over operation of the hatchery, processing plant and related facilities on November 1, 1982. It retained Gregory as the General Manager of the overall operation. His employment with Shenandoah commenced on November 1, 1982.

This controversy centers on a contract for the supply of turkey eggs to the Patoka, Indiana hatchery that Armour entered into with Western Turkey Egg Service ("Western") in June 1982. The contract between Western and Armour (the "Western contract") provided, *inter alia*, that Western was to supply the Patoka hatchery with 70,000 turkey eggs per week from September 27, 1982, until August 31, 1983. The eggs were priced at 49 cents each, F.O.B. at the Patoka hatchery, with a guaranteed fertility rate of 80 percent. In anticipation that the hatchery might be sold, Armour had secured a cancellation clause in the contract whereby the egg supply agreement could be cancelled for the period from January 1, 1983 through August 31, 1983, provided Western was given notice of the cancellation by December 1, 1982.

Among the operating contract assignments signed by Shenandoah President Thomas Ferrara at the November 8 and 9, 1982 closing was an "Assignment and Assumption Agreement" whereby Armour assigned to Shenandoah its rights, title and interest in the agreement "between Armour and Company and Western Turkey Egg Service, dated June 22, 1982, for the purchase of turkey eggs." The signed Agreement was mailed by Armour to Western President Herb Chafin on November 9, 1982. On November 15, 1982, Chafin signed a "Consent to Assignment and Acceptance" printed on the second page of the Assignment and Assumption Agreement, below the signature of Shenandoah President Ferrara, and returned two copies to Armour. The Comptroller of Armour's Washington area operations, John Goshinska, testified that he kept one copy and gave

the other to Shenandoah's Comptroller, George Wray, on November 19, 1982.

Sometime in November or December of 1982, General Manager Gregory's dissatisfaction with the fertility rate and quality of the eggs provided by Western prompted him to begin checking the availability of turkey eggs from other sources. His investigation revealed that turkey eggs with a guaranteed fertility rate of 85 percent were readily available at 46 cents each. The district court expressly found that in June 1982 Gregory had received the Armour interoffice memorandum, dated June 22, 1982, describing the terms of the Western contract and the court concluded that Gregory was aware of the option to cancel provision that contract incorporated. Nevertheless, Gregory did not contact Western President Chafin until sometime after December 1, 1982 to inform him of Shenandoah's desire to exercise the option to cancel the January 1, 1983 to August 31, 1983 portion of the egg supply contract. Chafin refused to allow Shenandoah to exercise the expired option.

In the months following, Shenandoah's dissatisfaction with the turkey eggs provided by Western grew. Shenandoah eventually began adjusting the price it paid to Western for the eggs. Western at first refused to accept the reduced payments. However, Shenandoah and Western eventually reached an agreement settling their dispute and entered into a mutual covenant not to sue. Shenandoah brought the present action against Armour on May 23, 1983.

## II

The complaint in this action is of three counts. Count I is a breach of contract claim seeking compensatory and consequential damages and attorneys' fees, expenses and costs based on the contention that Armour breached its duty under the Purchase Agreement to disclose the existence and terms of the Western contract in the manner required by the Agreement.[1]

---

1. Section 2.1 of the October 8, 1982, Poultry Plant Net Assets Purchase Agreement between Shenandoah and Armour states:

Seller agrees to sell, convey, assign, transfer and deliver to Buyer, or to cause the same to be done, and Buyer agrees to purchase, ac-

Count II seeks the same relief as Count I and alleges intentional misrepresentation and fraud by Armour based on its purported failure to give appellant adequate notice of the Western contract. Count III seeks punitive damages based on the contract breach and misrepresentation/fraud alleged in Counts I and II.

In its analysis, the district court several times pointed to the "interrelated" nature of Shenandoah's claims of contract breach and misrepresentation/fraud against Armour. Thus, with regard to the contract breach claim, the court identified the key question to be whether the execution of the Assignment and Assumption Agreement pertaining to the Western contract constituted a modification of the October 8, 1982 Purchase Agreement. The district court believed that if such a modification of the Purchase Agreement was worked by the Assignment and Assumption Agreement, Armour's arguable failure to satisfy its obligation under the Purchase Agreement to include the Western contract in the list of contracts that were to be assigned to and assumed by Shenandoah would be ameliorated. However, the district court observed that such an effect could be attributed to the execution of the Assignment and Assumption Agreement only if that act was legitimate (*i.e.*, if the assignment and assumption by Shenandoah was not procured by intentional misrepresentation or fraud on Armour's part).

The first, and primary, reason cited by the district court for entering judgment against Shenandoah was the undisputed fact that Douglas Gregory was aware of the Western contract and its cancellation clause. In that regard, the district court stated: "On November 1, 1982, Mr. Gregory became the manager of Shenandoah's Washington operations. He had a month to discuss the matter with his superiors and to cancel Shenandoah's obligations under the agreement. Instead ... Mr. Gregory concentrated on improving the processing plant." The court viewed Gregory's knowledge of the cancellation option in the Western contract and his failure to exercise that option during the month of November 1982 as "fatal" to Shenandoah's breach of contract claim. It found no merit in Shenandoah's contention that Gregory's knowledge of the Western contract and its terms could not be imputed to it because Gregory gained that knowledge before his employment with Shenandoah commenced, while he was still employed by Armour. Instead, it imputed Gregory's knowledge of the Western contract to Shenandoah, effective the date his employment with Shenandoah commenced, November 1, 1982.

In beginning its analysis of whether Shenandoah's assumption of the Western contract was procured by Armour through acts of misrepresentation and fraud, the district court noted several facts in the record that "are not easily explained." However, after discussing those facts, it concluded that Shenandoah had failed to prove either fraud or intentional misrepresentation by Armour. Because it perceived no motivation on Armour's part to have Shenandoah assume the Western contract, the court found no basis for holding that Armour knowingly misrepresented or hid the Western contract from Shenandoah. Further, it stated that Shenandoah had not shown that the signature of its President, Mr. Ferrara, on the Western assignment document had been fraudulently obtained by substituting (in place of an unsigned second page of that document) a page containing Mr. Ferrara's signature. Thus, the

---

cept, assume and take delivery of the following properties, assets and rights of Seller used in or related to its current conduct of the Business, on the closing date defined in Section 12.1 (the "Closing Date"):

(d) *"Contracts":* The contracts leases, licenses, permits and other agreements described in Exhibit "E", to the extent they shall not have been terminated on or before the take-over date defined in Section 12.1 (the "Take-over Date") and are assignable.

Section 5.1(a) of the Purchase Agreement provided that Shenandoah, as buyer, would assume, *inter alia,* the liabilities contained in the contracts accruing on the Take-over Date which were assigned to it on the closing date.

Shenandoah's breach of contract claim (as well as its misrepresentation/fraud claim) against Armour was triggered by Armour's failure to list the Western contract in Exhibit "E" of the Purchase Agreement.

district court clearly and unequivocally rejected Shenandoah's claims of misrepresentation and fraud against Armour.

Based on these key findings as to Shenandoah's two substantive claims against Armour, the district court entered judgment for Armour.

### III

■ Shenandoah's appeal is narrowly focused. It contends that this case presents a question of law as to whether the district court erred when it held that Douglas Gregory's knowledge of the Western contract was a "complete defense" to appellant's claims of breach of contract and misrepresentation (and fraud).[2] We see only one possible question of law presented by Shenandoah's appeal. That question is whether, as a matter of Indiana law, the district court correctly concluded that Gregory's undisputed knowledge of the existence and terms of the Western contract could be imputed to Shenandoah. Our review on this question of law is *de novo*. *Curtis v. Thompson*, 840 F.2d 1291, 1296 (7th Cir.1988). *See also United States v. L'Allier*, 838 F.2d 234, 240 (7th Cir.1988) (holding that a district court's determination of a question of law is reviewed *de novo*).

Three cases are the focus of our inquiry. The most significant is the opinion of the Indiana Supreme Court in *Prudential Insurance Co. of America v. Winans*, 263 Ind. 111, 113, 325 N.E.2d 204, 206 (1975), which establishes the following straightforward rule of Indiana law: "Generally the knowledge of an agent acting within the scope of his authority is imputed to his principal." In *City of Indianapolis v. Bates*, 137 Ind.App. 227, 205 N.E.2d 839 (Ind.1965), cited by the Indiana Supreme Court in *Winans* and relied on by Shenandoah, the former Appellate Court of Indiana stated: "A principal is charged with the knowledge of that which his agent by ordinary care could have known where the agent has received sufficient informa-

tion to awaken inquiry." *Bates*, 137 Ind. App. at 241, 205 N.E.2d at 847 (citing *Travelers Ins. Co. v. Eviston*, 110 Ind.App. 143, 37 N.E.2d 310 (1941)). After articulating the general rule cited above, the Appellate Court in *Bates* went on to state:

> Knowledge of material facts acquired by an agent in the course of his employment, and within the scope of his authority, is the knowledge of the principal, and where no actual knowledge of the principal is shown, the rule will be given the effect on the theory of constructive knowledge, resting on the legal principle that it is the duty of the agent to disclose to his principal all material facts coming to his knowledge, and, upon the presumption that he has discharged that duty.

*Id.* (citing *National Mutual Ins. Co. of Celina, Ohio v. Bales*, 81 Ind.App. 302, 139 N.E. 703 (1923)).

In *Jones v. City of Logansport*, 436 N.E. 2d 1138 (Ind.App.1982), a plaintiff employee of a construction subcontractor brought suit against the city and its prime contractor on a sewage treatment plant construction project. The plaintiff was injured when a crane he was operating came into contact with uninsulated high voltage electrical lines. In appealing the grant of summary judgment for the city by the state trial court, the plaintiff argued that the agent the city had hired to oversee the construction project was aware of the presence at the construction site of uninsulated electrical lines and that this knowledge could therefore be imputed to the city.

The Indiana Court of Appeals rejected this assertion by the plaintiff/appellant because of its finding that the agent was not responsible for safety matters at the sewage plant construction site. Thus, because the agent did not have a duty to ameliorate the purportedly unsafe condition, the court of appeals held that any knowledge the agent may have had of the alleged unsafe condition could not be imputed to its principal, the city. In so holding, the court set forth this qualification as to the scope of

---

**2.** In its brief, Shenandoah did not make any express reference to the allegation of fraud

raised by Count II of its complaint.

matters within the knowledge of an agent that can be imputed to his/her principal. "An agent's knowledge will be imputed to the principal only when the matter is within the scope of the agent's authority and with reference to matters over which the agent's authority extends." *Jones*, 436 N.E.2d at 1151.

In its initial brief, Shenandoah states that it "does not dispute the general rule [of Indiana law] that knowledge of an agent can be imputed to the principal, even though the information of which the agent has knowledge is never actually communicated to the principal." However, it submits that under Indiana law, this general rule is limited to circumstances where the agent's knowledge is acquired in the course of the agent's employment with the principal. It cites *Bates* and *Jones* in support of that assertion. Our research leads us to conclude that Shenandoah misconstrues the controlling Indiana law.

We are convinced that under Indiana law, the knowledge General Manager Gregory had of the existence and terms of the Western contract, including the December 1, 1982 deadline for cancellation of the balance of the contract, can properly be imputed to Shenandoah. Gregory was in charge of the entire hatchery and processing plant operation and all of the related facilities. The Western contract for the supply of turkey eggs to the hatchery certainly fell within the scope of Gregory's authority to act on behalf of his employer, Shenandoah, as of November 1, 1982 and thereafter. *See Winans*, 263 Ind. at 113, 325 N.E.2d at 206; *Jones*, 436 N.E.2d at 1151. As of November 1, 1982, Gregory was Shenandoah's agent. Because his knowledge of the terms of the Western contract was material to the operation of the hatchery and processing plant operation, Gregory, as Shenandoah's agent, had a duty to disclose that knowledge to his principal. *Bates*, 137 Ind.App. at 421, 205 N.E.2d at 847. Thus, regardless of whether Gregory discharged his duty to disclose the terms of the Western contract to Shenandoah, Shenandoah can be charged with constructive knowledge of those contract terms, including the cancellation option. *Id.*

The fact that Gregory was not involved in the negotiations that led to Shenandoah's purchase of the Washington, Indiana operation from Armour is immaterial to the question of whether his knowledge of the Western contract can be imputed to Shenandoah. It also is of no consequence that Gregory may have obtained the knowledge of the Western contract as early as four months before he became an employee of Shenandoah, while he was still employed by Armour.[3] *See* RESTATEMENT (SECOND) OF AGENCY § 276 (1957) ("Except for knowledge acquired confidentially, the time, place, or manner in which knowledge is acquired by a servant or other agent is immaterial in determining the liability of his principal because of it.") *See also id.*, comment a ("Since the mind of the agent cannot be divided into compartments, the principal should be bound by whatever knowledge the agent has irrespective of its source or time of acquisition unless it is the kind of knowledge which the agent can properly disregard in the specific case be-

---

3. Nothing in *Winans, Bates* or *Jones* indicates the qualification asserted by Shenandoah, *i.e.*, that the knowledge of an agent-employee will be imputed to his/her principal/employer only if the agent obtained that knowledge while employed by that principal. It is true that the knowledge imputed to the principal in *Winans* was acquired by the agent in the course of his employment with the principal. The same was true in *Bates*.

The second portion of *Bates* which we quote in the text does make reference to the "[k]nowledge of material facts acquired by an agent in the course of employment" being imputed to the agent's principal. 137 Ind.App. at 241, 205 N.E. 2d at 847. It is this portion of the opinion in

*Bates* that Shenandoah apparently relies on to support its contention that the knowledge of General Manager Gregory as to the existence and terms of the Western contract cannot be imputed to it. The language of *Bates* cited immediately above followed the Indiana Appellate Court's statement of the previously discussed broad, general rule of imputation of an agent's knowledge to the principal. Given that fact, we believe the subsequent language in *Bates* to be only an adaptation of the general, controlling rule to the specific facts present in that case and not a rearticulation or narrowing of the rule itself. We find Shenandoah's interpretation of *Bates* unpersuasive.

cause of having acquired it confidentially.").[4] Therefore, we conclude that the district court did not err when it determined that Gregory's knowledge of the Western contract could be imputed to Shenandoah.

## IV

But for the previously-addressed contention as to the propriety of the imputation of Gregory's knowledge, Shenandoah does not assert that the district court relied on improper legal standards in entering judgment in favor of Armour. Rather, the remainder of its argument is devoted to attempts to rebut the district court's findings of fact. Consequently, the balance of our review of the district court's actions will be limited to a clear error analysis. FED.R.CIV.P. 52(a). *See Andre v. Bendix Corp.*, 841 F.2d 172, 176 (7th Cir.1988) (holding that on review, pursuant to FED.R. CIV.P. 52(a), the findings of fact of a district court "shall not be set aside unless clearly erroneous"); *see also EEOC v. Sears, Roebuck & Co.*, 839 F.2d 302, 310 (7th Cir.1988).

As noted previously, the district court's decision to grant judgment for Armour was based on several key findings of fact. The district court concluded that Shenandoah failed to prove an act of fraud or misrepresentation on Armour's part. Thus, it determined, in effect, that the signature of Shenandoah President Thomas Ferrera on the Western Turkey Egg Service Assumption and Assignment Agreement was genuine and that the document was binding on Shenandoah. The district court also determined that Shenandoah, through Douglas Gregory, had knowledge both of the nature of Western's past performance and of the cancellation option incorporated in the Western contract.

Shenandoah does not directly challenge the district court's finding that it failed to prove intentional misrepresentation or fraud by Armour. The contentions it raises as to the inferences warranted by the evidence do not support a finding of clear

error with regard to this first crucial finding of fact by the district court. Accordingly, we must accept the district court's holding that Armour did not commit an act of intentional misrepresentation or fraud and we need not further evaluate the propriety of the district court's rejection of appellant's Count II claims.

▉ There are two discernible bases for the district court's entry of judgment for Armour on Shenandoah's Count I breach of contract claim. First, it is apparent from the manner in which the district court framed its analysis that in rejecting appellant's misrepresentation/fraud claim, the court effectively concluded that Shenandoah's execution of the Assignment and Assumption Agreement pertaining to the Western contract rendered inconsequential Armour's arguable technical breach of its obligation under the October 8, 1982 Purchase Agreement to expressly inform Shenandoah of the existence of the Western contract.

▉ The second basis for the district court's rejection of Shenandoah's breach of contract claim is found in its analysis of the significance of General Manager Gregory's knowledge of the terms of the Western contract and his, and Shenandoah's, failure to exercise the cancellation option provided by that contract in a timely manner. The district court's opinion does not employ proximate cause terminology. Nevertheless, it is clear that the key to the court's denial of appellant's Count I breach of contract claim was its conclusion that Shenandoah's injury resulted, not from Armour's arguable technical breach of the Purchase Agreement, but rather from Shenandoah's own failure, during the month of November 1982, to exercise the cancellation option in the Western contract. Thus, the district court stated: "Mr. Gregory's knowledge of the terms of the Western contract and the fact that it could have been cancelled for the first month of his employment with

---

**4.** There is no evidence in the record to indicate that Gregory acquired his knowledge of the

Western contract confidentially.

**1020**

Shenandoah are fatal to the breach of contract claim."

It is clearly established in Indiana law that a plaintiff can recover damages for breach of contract only when he/she is able to establish that the purported breach was the proximate cause of his/her injury. *See Terre Haute Regional Hospital, Inc. v. El–Issa, M.D.,* 470 N.E.2d 1371, 1382 (Ind. App.1984) ("In a breach of contract action only those damages proximately resulting from the breach are recoverable."); *Alber v. Standard Heating & Air Conditioning, Inc.,* 476 N.E.2d 507, 511 (Ind.App.1985) ("Generally, a breaching party is liable for all injuries proximately resulting from his wrongful acts."); *Tipton County Abstract Co. v. Heritage Federal Savings and Loan Association,* 416 N.E.2d 850, 853 (Ind.App. 1981) (stating that a defendant in a breach of contract suit cannot be held liable "for damages caused by factors other than his breach" and "[i]t is axiomatic that a breaching party is only liable for losses caused by his breach").[5]

The district court's tacit focus on the proximate cause question establishes that it applied the correct legal standard for evaluating the effect of Gregory's knowledge of the Western contract on Shenandoah's breach of contract claim against Armour. Accordingly, our scrutiny of that aspect of the district court's holding is limited to a review of the soundness of its implied finding of fact that it was Shenandoah's failure to act to cancel the Western contract during the period from November 1, 1982 through December 1, 1982 that was the proximate cause of the injury it claims to have incurred. Having evaluated all of the relevant evidence in the record, we are unable to deem that finding of fact by the district court to have been clear error.

## V

The district court's determination that Shenandoah failed to prove that Armour engaged in either an act of fraud or intentional misrepresentation against Shenandoah is unchallenged and must be accepted. We have ascertained that the district court did not err when it found that Shenandoah's own inaction during the period from November 1, 1982 through December 1, 1982 was the proximate cause of its injury. Accordingly, we will affirm.

The judgment of the district court is AFFIRMED.

---

5. We have previously ascertained a suitable basis for affirming the district court's judgment as it pertains to Shenandoah's misrepresentation/fraud claim against Armour. However, as an alternative basis for that holding, we note that Indiana law also requires as a prerequisite for the recovery of damages in a misrepresentation/fraud case proof by plaintiff that the defendant's tortious actions were a proximate cause of his/her injuries. *Captain & Co. v. Stenberg,* 505 N.E.2d 88, 98 (Ind.App.1987) (holding that a plaintiff is entitled to recover for fraudulent [mis]representation when his/her injury is "the proximate consequence of [his/her] reliance on the fraudulent representations."

The court went on to state: "Obviously, the recovery must be limited to those damages which were the proximate result of the deceptive act."). We have determined that the district court's implied finding that Shenandoah's inaction, and not the actions of Armour, was the proximate cause of Shenandoah's injuries was not clear error. Thus, even if Shenandoah had proven that Armour engaged in an act of misrepresentation and/or fraud, appellant would not be able to recover damages because of its failure to establish the necessary proximate cause nexus between its injuries and the conduct of Armour.