In the

# United States Court of Appeals

## For the Seventh Circuit

No. 15-1243

D.U., a minor,

*Plaintiff-Appellant*,

*v.*

KITTY RHOADES and
KELLY TOWNSEND,

*Defendants-Appellees*.

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 2:13-cv-01457 — **Nancy Joseph**, *Magistrate Judge.*

ARGUED MARCH 30, 2016 — DECIDED JUNE 3, 2016

Before WOOD, *Chief Judge,* and POSNER and ROVNER, *Circuit Judges.*

ROVNER, *Circuit Judge.* D.U. is a minor who was receiving the assistance of a Medicaid-funded private duty nurse for seventy hours each week after a catastrophic accident rendered her severely disabled. After many years of care, the State of Wisconsin determined that full-time skilled nursing assistance was no longer medically necessary for D.U.'s care, and the

State denied further authorization of that level of care. D.U. then sued Kitty Rhoades, Secretary for the Wisconsin Department of Health Services ("DHS"), and Kelly Townsend, a nurse consultant in the Quality Assurance and Appropriateness Review Section ("QAARS") in the DHS Office of the Inspector General, asserting that the reduction in hours of her private duty nurse is a violation of the Medicaid Act. *See* 42 U.S.C. § 1396 *et seq*. D.U. moved for a preliminary injunction, asking the court to compel the State to provide seventy hours of private duty nursing care each week pending the outcome of the lawsuit. The district court denied the motion for a preliminary injunction. Although we conclude that the district court erred in assessing D.U.'s likelihood of success on the merits of her claim, we affirm because D.U. has failed to demonstrate that she will suffer irreparable harm if the injunction is denied.

**I.**

In 2005, when she was three years old, D.U. was severely injured in a car accident. She initially qualified for Wisconsin Medicaid services on financial grounds, and was provided extensive medical care through that program until August 2013. After a change in family circumstances in 2013, D.U. no longer qualified on financial grounds for State-provided services. Wisconsin nevertheless continued to provide the same services under the State's "Katie Beckett Program," which funds Medicaid benefits for children who are otherwise ineligible because of the assets or income of their parents. *See* 42 U.S.C. § 1396a(e)(3) (allowing states to provide Medicaid benefits at home to severely disabled children who would otherwise require institutional care). Other than the financial

qualifications, benefits under the Katie Beckett Program are subject to the same rules as ordinary Medicaid benefits.

Certain services must be reviewed and authorized by DHS before Wisconsin Medicaid will pay for them. Medical services are approved if an application and supporting documentation demonstrate that the services are medically necessary. The care that D.U. requested and received for many years was private duty nursing care. A patient qualifies for private duty nursing if she requires skilled nursing care for eight or more hours each day. In D.U.'s case, private duty nursing was provided by the State for seventy hours per week. "Skilled nursing" includes the provision of medically complicated care "furnished pursuant to a physician's orders which require the skills of a registered nurse or licensed practical nurse and which are provided either directly by or under the supervision of the registered nurse or licensed practical nurse." Wis. Admin Code § DHS 101.03(163). The regulation lists examples of services that would qualify as skilled nursing:

> (a) Intravenous, intramuscular, or subcutaneous injections and hypodermoclysis or intravenous feeding;
>
> (b) Levin tube and gastrostomy feedings;
>
> (c) Nasopharyngeal and tracheotomy aspiration;
>
> (d) Insertion and sterile irrigation and replacement of catheters;
>
> (e) Application of dressings involving prescription medications and aseptic techniques;

(f) Treatment of extensive decubitus ulcers or other widespread skin disorder;

(g) Heat treatments which have been specifically ordered by a physician as part of active treatment and which require observation by nurses to adequately evaluate the patient's progress;

(h) Initial phases of a regimen involving administration of medical gases; and

(i) Rehabilitation nursing procedures, including the related teachings and adaptive aspects of nursing that are part of active treatment, e.g., the institution and supervision of bowel and bladder training programs.

Wis. Admin Code § DHS 101.03(163).

In February 2013, the State authorized a continuation of private duty nursing for D.U. through the end of July 2013. However, the authorization noted that D.U., whose condition had substantially improved over the years, was now "borderline" for meeting the criteria to qualify for private duty nursing care. D.U. was instructed to submit additional information with her next request. In August 2013, the State informed D.U. and her father that D.U. no longer qualified for private duty nursing services. In order to transition D.U. to an alternate level of care, the State authorized three additional months of private duty nursing. In November, as the clock ran out on authorized services, D.U. filed a new request for seventy hours per week of private duty nursing. At the State's request, D.U. submitted additional information, but the request was ulti-

mately denied on the ground that the documentation submitted by D.U. did not support a need for at least eight hours of skilled nursing care per day. Although an administrative appeal was available, D.U. did not appeal the denial of skilled nursing services. Instead, she filed this suit and moved for a preliminary injunction requiring the State to continue providing skilled nursing services. The district court concluded that the evidence that D.U. submitted in support of her request for injunctive relief failed to demonstrate a likelihood of success on the merits. The court therefore denied D.U.'s request for an injunction, and D.U. filed this interlocutory appeal.

## II.

On appeal, D.U. contends that the court misapplied the medical necessity standard and also erred in assessing whether D.U. met the standard for a preliminary injunction. "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). A preliminary injunction is an extraordinary remedy and is never awarded as of right. *Id.* at 24. We review the district court's findings of fact for clear error, its legal conclusions *de novo*, and its balancing of the factors for a preliminary injunction for abuse of discretion. *Stuller, Inc. v. Steak N Shake Enterprises, Inc.*, 695 F.3d 676, 678 (7th Cir. 2012); *United Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l*, 563 F.3d 257, 269 (7th Cir. 2009); *Hodgkins ex rel. Hodgkins v. Peterson*, 355 F.3d 1048, 1054-55 (7th Cir. 2004).

The district court began and ended its analysis on the first factor, finding that D.U. was unlikely to succeed on the merits and therefore was not entitled to a preliminary injunction. The district court framed the issue as "whether D.U. has established that she has a more than negligible chance of persuading the trier of fact by a preponderance of the evidence that at least 70 hours of private duty nursing services is medically necessary." Applying this standard, the court found that the records submitted did not demonstrate that D.U.'s private duty nurse was medically necessary for her care.

D.U. contends that, in reaching this conclusion, the district court misapplied the standards under the Early and Periodic Screening, Diagnostic and Treatment Services ("EPSDT") provision of the Medicaid Act. *See* 42 U.S.C. § 1396d(r). The EPSDT provision mandates that the states provide certain categories of care to all Medicaid-eligible patients under the age of twenty-one. In addition to screening services, a catch-all provision of EPSDT requires participating states to provide to these children "[s]uch other necessary health care, diagnostic services, treatment, and other measures described in subsection (a) of this section to correct or ameliorate defects and physical and mental illnesses and conditions discovered by the screening services, whether or not such services are covered under the State plan." Private duty nursing is one of the categories of services mandated under EPSDT, but states are free to limit the provision of services based on medical necessity. 42 C.F.R. § 4.230(d). Although EPSDT broadened the categories of care that participating states are required to provide to Medicaid-eligible children, it did not change the medical necessity limitation.

Medical necessity is not expressly defined in the Medicaid Act, but Wisconsin law provides that:

> "Medically necessary" means a medical assistance service under ch. DHS 107 that is:
>
> (a) Required to prevent, identify or treat a recipient's illness, injury or disability; and
>
> (b) Meets [certain] standards[.][1]

Wis. Admin. Code § DHS 101.03(96m). The medical necessity determination is made in Wisconsin by QAARS consultants such as defendant Kelly Townsend, who review information submitted by the applicant's health care providers.

---

[1] The nine enumerated standards are: "1. Is consistent with the recipient's symptoms or with prevention, diagnosis or treatment of the recipient's illness, injury or disability; 2. Is provided consistent with standards of acceptable quality of care applicable to the type of service, the type of provider and the setting in which the service is provided; 3. Is appropriate with regard to generally accepted standards of medical practice; 4. Is not medically contraindicated with regard to the recipient's diagnoses, the recipient's symptoms or other medically necessary services being provided to the recipient; 5. Is of proven medical value or usefulness and, consistent with § DHS 107.035, is not experimental in nature; 6. Is not duplicative with respect to other services being provided to the recipient; 7. Is not solely for the convenience of the recipient, the recipient's family or a provider; 8. With respect to prior authorization of a service and to other prospective coverage determinations made by the department, is cost-effective compared to an alternative medically necessary service which is reasonably accessible to the recipient; and 9. Is the most appropriate supply or level of service that can safely and effectively be provided to the recipient." Wis. Admin. Code § DHS 101.03(96m).

In support of the motion for preliminary relief and in an attempt to demonstrate the medical necessity of eight hours per day of skilled nursing care, D.U. submitted the statement of Karen Roberts, who had served as D.U.'s case manager and registered nurse for seven years; letters from two physicians who treated D.U.; and some of D.U.'s medical records. One doctor stated that the skilled nursing services provided to D.U. have "assisted in her recovery/functionality and helped to avoid inpatient hospital stays." That physician also stated that D.U. has "greatly benefitted from skilled nursing services," and therefore requested "a continuation of this very important and beneficial service." R. 53. The other doctor chronicled D.U.'s progress over the years, noting that, initially D.U. was "in her own world, wheel chair bound, aphasic, g-tube fed and having seizures," but that now she is "socially interactive, walking with assistance, verbalizing, self feeding, and only occasionally having seizures." The second doctor attributed D.U.'s impressive progress to the skilled nursing care she received over the years and concluded that for "continued improvement, she will require at least 70 hours of skilled nursing a week," but the doctor did not identify the specific skilled nursing tasks required for D.U.'s care. This is the only document that quantifies in any manner the number of hours of skilled nursing services required for D.U.'s care.

D.U.'s nurse, Karen Roberts, submitted the most extensive evidence of the services required to care for D.U., listing in a seventy-eight paragraph affidavit the services that she was providing to D.U. as of August 2014. Roberts listed D.U.'s diagnoses as "post traumatic hydrocephalus, post traumatic seizure disorder, general epilepsy with myoclonic seizures, rt.

spastic hemiparesis, parietal-occipital shunt, visual-hearing disorder, spastic cerebral palsy-displegia, incontinence of bowel/bladder, early puberty, development and cognitive delay, vocalization and speech delayer non-verbal, limited fine motor and gross motor abilities, apraxia/dyspraxia, ataxia." Among the services that Roberts provided to D.U. are speech therapy, monitoring of food and liquid intake, monitoring of D.U.'s ability to chew and swallow (and providing suction as needed to prevent choking), training and assistance in eating and nutrition, auditory stimulation, vision therapy, neuro-muscular electrical stimulation, occupational and physical therapy, placement of splints and braces as needed, monitoring for and treatment of leg spasms, assessment of and intervention for mood and behavioral issues, assessment of motor and sensory functions, assistance with wheelchair training and use, assistance with weight-bearing exercises and gait training, transportation to and assistance in hippotherapy and aqua-therapy, assistance in all activities of daily living, daily assessment of blood circulation in the extremities to prevent complications from poor circulation, consulting with physicians regarding D.U.'s care, transportation in a specialized van to all needed locations, and continual assessment for skin breakdown, deformities and contractures.

The State takes the position that, although D.U.'s health care providers describe skilled nursing care as *beneficial* to D.U., only one of the care givers described seventy hours of skilled nursing care as medically *necessary* at this stage of D.U.'s treatment. And none of the care givers identify eight hours of specific skilled nursing tasks required for D.U.'s care each day. Kelly Townsend, the nurse who evaluates requests

for Medicaid-funded private duty nursing, also submitted an
affidavit, explaining the basis of the denial for D.U. According
to Townsend, the skilled nursing activities identified in D.U.'s
application for a private duty nurse consisted primarily of
assessing and monitoring D.U., services that could be provided
in a medical office or by a parent, a trained school aide or child
care worker. Townsend averred that private duty nursing will
not be deemed medically necessary for assessing and monitor-
ing tasks that could be provided by other persons with proper
training. Private duty nursing will also not be approved for
other activities, such as showering, applying lotion, assessing
urine output, providing verbal cues for eating and checking for
skin breakdown, because these tasks can be performed by
personal care workers, home health aides or family members.
Nor is private duty nursing deemed necessary for routine
transportation or taking a child to medical appointments.

Townsend noted that most of the care provided by D.U.'s
private duty nurse is not listed in Wisconsin Medicaid guide-
lines as the type of care that requires skilled nursing.
Townsend conceded that the services listed in the guidelines
are not exclusive, but she averred that the guidelines demon-
strate the nature of the services and the severity of medical
needs that require skilled nursing services. She opined that
many of the services listed by D.U.'s nurse were the type of
care that can be provided by a paraprofessional such as a home
health aide or personal care worker, or by parents, informal
supports or therapists. Townsend also said that parapro-
fessionals, teachers, school aides, family members and other
care givers could be taught how to respond to potential
medical needs and how to determine when additional medical

services are required. Townsend noted that D.U. had been trending for some time towards no longer requiring eight hours per day of skilled nursing, that she had been "border-line" for meeting the criteria at the time of her last approval for private duty nursing services, and that her records indicated that she was medically stable and no longer in need of eight hours per day of skilled nursing intervention. As for information submitted by D.U.'s father, Townsend noted that the relatively infrequent focal seizures that D.U. experienced were not inherently dangerous or life threatening, do not result in loss of consciousness, and can be assessed by trained care givers to determine if medical intervention is required. Moreover, D.U. had not experienced more severe seizures that required medication injections in the three months prior to the application.[2] Townsend noted that D.U. might qualify for a lesser amount of skilled nursing services known as "intermittent skilled nursing," but that she had not applied for it.

Based on this evidence, the district court found that D.U. failed to establish a likelihood of success on the merits. But the threshold for demonstrating a likelihood of success on the merits is low. *Michigan v. United States Army Corps of Engineers*, 667 F.3d 765, 782 (7th Cir. 2011). In framing the probability of success necessary for a grant of injunctive relief, we have said repeatedly that the plaintiff's chances of prevailing need only

---

[2] D.U. noted in her opening brief that the State requested seizure and injection logs, and then denied private duty nursing when D.U. failed to produce the logs. D.U. postulated that she would have been approved for skilled nursing had she provided the requested logs. Yet she also inexplicably failed to produce the logs (if they exist) to the district court.

be better than negligible. *See Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the United States of America, Inc.*, 549 F.3d 1079, 1096 (7th Cir. 2008) (to obtain preliminary relief, the plaintiff must show it has a better than negligible chance of success on the merits of at least one of its claims); *Lineback v. Spurlino Materials, LLC*, 546 F.3d 491, 502-03 (7th Cir. 2008) (same); *Curtis v. Thompson*, 8 F.2d 1291, 1296 (7th Cir. 1988) (same). In requiring D.U. to establish "that she has a more than negligible chance of persuading the trier of fact by a preponderance of the evidence that at least 70 hours of private duty nursing services is medically necessary," the district court may have overstated D.U.'s burden at this stage of the proceedings:

> This circuit employs a "sliding scale" approach in deciding whether to grant or deny preliminary relief; so that even though a plaintiff has less than a 50 percent chance of prevailing on the merits, he may nonetheless be entitled to the injunction if he can demonstrate that the balance of harms would weigh heavily against him if the relief were not granted[.]

*Curtis*, 8 F.2d at 1296. As we noted in *Curtis*, the sliding scale approach is limited by the plaintiff first demonstrating "at least" a negligible chance of success on the merits. *Id*. But once that low threshold is met, the court must consider and balance the remaining factors.

For a number of reasons, we conclude that D.U. met that threshold here. First, D.U. demonstrated several diagnoses associated with severe impairments. Second, she had qualified for private duty nursing for a number of years and had only

recently been rated as "borderline" for this type of care. The State's use of the word "borderline" suggests that D.U. is very close to qualifying for this care if she provides adequate documentation supporting the opinions of her doctors and nurse. Third, one of her doctors and the nurse who treated her for seven years were of the opinion that D.U. still requires this level of care. Finally, a second doctor noted that skilled nursing care would be beneficial to D.U., which would suggest that this level of care would meet at least some of the nine criteria under the Wisconsin statute. Wis. Admin. Code § DHS 101.03(96m). In fact, the evidence submitted by both doctors and by D.U.'s nurse suggest that skilled nursing care would meet those nine criteria, but the district court undertook no analysis of those factors after concluding that D.U. failed to meet the threshold requirement. Although D.U. may not have yet presented enough documentation in support of her claim to meet the preponderance of the evidence standard necessary to ultimately prevail, she has certainly presented enough evidence to show that she has a more than negligible chance of succeeding on the merits.

Because D.U. has met that threshold inquiry, we turn to the other factors for obtaining a preliminary injunction. D.U. objects that the court failed to consider the other factors, including whether she will suffer irreparable harm without the care of a private duty nurse, whether the balance of equities tips in her favor and whether an injunction is in the public interest.[3] Plaintiffs seeking preliminary relief must demon

---

[3] On the last two factors, she makes only undeveloped and conclusory

(continued...)

strate that irreparable injury is likely in the absence of an injunction. *Winter*, 555 U.S. at 22. In *Winter*, the Court noted that "[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.*

In seeking to demonstrate that she will suffer irreparable harm, D.U. cites the depletion of a special needs trust that was established after the settlement of claims related to the accident that caused her injuries. She contends that the trust has been paying for her skilled nursing care since the State stopped providing it, and that the trust was intended to supplement Medicaid services, not supplant it. At oral argument, her attorney explained that the settlement of claims resulted in a structured settlement that provided an initial fund plus a monthly annuity that was designed to allow her to continue to qualify for public assistance. By the time of oral argument, counsel stated that the initial fund had been depleted to a value of $269, and that the monthly annuity was being used to pay for skilled nursing services. D.U. is also receiving services from a Medicaid-funded personal care worker, although Townsend noted that D.U. was not using the full amount of personal care worker services that had been authorized as of January 2014. The only harm that D.U. claims at this time is the depletion of funds.

---

[3] (...continued)
claims. Because we ultimately conclude that she failed entirely to demonstrate irreparable harm, we need not consider these factors further.

Because money damages could make D.U. whole again should she prevail in her lawsuit, she does not meet the standard for irreparable harm. *Girl Scouts*, 549 F.3d at 1095 (a party seeking a preliminary injunction must demonstrate, among other things, that traditional legal remedies, such as money damages, would be inadequate). *See also Sampson v. Murray*, 415 U.S. 61, 90 (1974) (noting that "[m]ere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough" to demonstrate irreparable harm and that the "possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm."). At oral argument, D.U.'s attorney asserted that there was no mechanism in Wisconsin law for obtaining a refund of the money expended on skilled nursing. But if D.U. prevails on the merits of her suit, a federal court order will provide the only process required. Because D.U. failed to demonstrate irreparable harm, the district court did not err in denying the preliminary injunction.

AFFIRMED.