In the

# United States Court of Appeals

### For the Seventh Circuit

———————

No. 22-2183

THE BAIL PROJECT, INC.,

*Plaintiff-Appellant,*

*v.*

COMMISSIONER, INDIANA DEPARTMENT OF INSURANCE,

*Defendant-Appellee.*

———————

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:22-cv-00862-JPH-MJD — **James Patrick Hanlon**, *Judge.*

———————

ARGUED DECEMBER 7, 2022 — DECIDED AUGUST 3, 2023

———————

Before FLAUM, KIRSCH, and JACKSON-AKIWUMI, *Circuit Judges.*

KIRSCH, *Circuit Judge.* The Bail Project, Inc., is a nonprofit organization that advocates for the abolition of cash bail. At the core of its advocacy, the organization pays cash bail for thousands of individuals across the country. Its aim is to show that conditioning a pretrial defendant's release upon the payment of money is not necessary to secure appearances at future court dates. In response to The Bail Project's efforts in

Indiana, the legislature passed, and the governor signed into law, House Enrolled Act 1300. The law requires charitable bail organizations like The Bail Project to register with the State. It also limits for whom such organizations can pay cash bail. The Bail Project sued in federal court and requested a preliminary injunction to enjoin the Commissioner of Indiana's Department of Insurance from enforcing the law. It argued that HEA 1300 (which had not yet gone into effect) would violate its First Amendment right to free speech and its Fourteenth Amendment right to equal protection. The district court declined to issue an injunction after concluding that The Bail Project had not shown a likelihood of success on the merits.

The principal question on appeal is whether the conduct HEA 1300 regulates—the payment of cash bail—is protected by the First Amendment. We hold that it is not. Although The Bail Project pays cash bail for pretrial defendants with the intent to communicate its message and to further its advocacy, a reasonable observer would not understand the conduct itself as communicating any message without additional explanatory speech. Thus, paying cash bail is not inherently expressive conduct, and HEA 1300 does not implicate the First Amendment. We also conclude that the law does not violate the Equal Protection Clause because it is rationally related to the State's legitimate interest in regulating pretrial detention of criminal defendants. Because The Bail Project has not shown a likelihood of success on the merits of either claim, we affirm the district court's denial of a preliminary injunction.

I

A

Indiana "strongly encourages pretrial release for many accused individuals awaiting trial." *DeWees v. State*, 180 N.E.3d 261, 268 (Ind. 2022) (citing Ind. R. Crim. P. 26). If a defendant does not present a "substantial risk of flight or danger" to others, then the trial court must "consider releasing the arrestee without money bail or surety," subject to any reasonable conditions deemed appropriate by the court. Ind. Code § 35-33-8-3.8(b). But if a court finds that a defendant poses a risk of flight or a danger to the community, then it has "broad discretion" to set bail and other conditions of release. *DeWees*, 180 N.E.3d at 266–68; see also Ind. Code §§ 35-33-8-3.8, 35-33-8-4(b); Ind. R. Crim. P. 26. Bail may not be set any higher than "reasonably required to assure the defendant's appearance in court" or "to assure the physical safety of another person or the community[.]" Ind. Code § 35-33-8-4(b).

There are two primary ways a defendant can make bail in Indiana. One is a surety bond. *Id.* § 35-33-8-3.2(a)(1)(A). A surety bond is, in essence, an insurance arrangement where someone pays a non-refundable, partial amount of the bail (usually about ten percent) to a licensed bail-bond agent, who then presents proof of an insurance policy for the entire bail amount to the county clerk. With minimal exceptions, only licensed bail agents may post surety bonds in Indiana. See *id.* § 27-10-3-1.

The second option is cash bail, which requires full payment of the bail amount to the county clerk. *Id.* § 35-33-8-3.2(a)(1)(B). If the defendant appears at all subsequent court proceedings, the funds are returned at the conclusion of the

case to whoever made the deposit. See *Garner v. Kempf*, 93 N.E.3d 1091, 1097–98 (Ind. 2018). If the defendant fails to appear, then the entirety of the cash bail may be forfeited. See Ind. Code § 35-33-8-7. Before HEA 1300, Indiana law placed no limit on who could pay cash bail for any pretrial defendant eligible for release.

B

Enter The Bail Project, Inc.—a nonprofit corporation dedicated to ending cash bail and other policies that condition a defendant's pretrial release upon the payment of money. The organization believes that cash bail has a corrosive effect because it forces indigent and low-income defendants to needlessly remain in jail simply because they can't afford to pay.

At the center of its campaign, The Bail Project pays cash bail in full for its clients. The goal is to demonstrate that paying cash bail is unnecessary to ensure pretrial defendants' appearances at future court dates. The organization keeps a revolving bail fund that both pays for a client's bail and receives refunded bail deposits if the client makes all required court appearances. Once The Bail Project decides to pay bail for a client, it develops an individualized post-release support plan to help the client make it to future court dates. In total, the organization has provided bail assistance for more than 22,000 individuals across 20 states. According to The Bail Project, its clients have a 92% appearance rate, so the overwhelming amount of bail money it has posted has been returned to its revolving fund.

The Bail Project considers multiple factors when selecting its clients, but it does not rule out candidates based on the crime an individual is charged with. The organization

therefore pays bail for defendants charged with a variety of crimes, including serious and violent crimes. The Bail Project believes that it is especially important to pay bail for persons charged with (or previously convicted of) serious offenses because doing so "most effectively demonstrates the fallacy of requiring the payment of cash bail."

The Bail Project's ultimate goal is to inspire systemic reforms to eliminate cash bail by showing that it is unnecessary. The organization advances its message in many ways, including on its website, which states: "[W]e believe that ending cash bail is one of the defining civil rights and racial justice issues of our day. Through our efforts, we seek to eliminate cash bail and ultimately put ourselves out of business." Although the organization's advocacy includes both speech and conduct, The Bail Project views the act of paying cash bail as its essential expressive activity.

## C

The Bail Project began operating in Indiana in 2018 and has assisted approximately 1,000 pretrial defendants in Marion County and Lake County. Its clients in Indiana include those who have been charged with, or previously convicted of, offenses that qualify as crimes of violence under state law. See Ind. Code § 35-50-1-2(a). To pay bail for its clients in Indiana, The Bail Project sends an employee to the relevant county clerk's office to pay the cash deposit and complete the required paperwork. The only observers of The Bail Project's bail payments are the county clerk's office employees and bystanders who happen to be in the office.

In response to The Bail Project's efforts, Indiana enacted HEA 1300. See 2022 Ind. Leg. Serv. P.L. 147-2022, codified at

Ind. Code §§ 27-10-2-4.1, et seq. HEA 1300 requires the Commissioner of Indiana's Department of Insurance to regulate charitable bail organizations. Ind. Code § 27-10-2-4.1. It defines "charitable bail organization" to mean "a business entity, or a nonprofit organization … that exists for the purpose of paying cash bail for another person[,]" with some exceptions that have no application here. *Id.* § 27-10-2-4.5(a).

Under HEA 1300, charitable bail organizations must receive certification from the Commissioner to operate in Indiana. *Id.* § 27-10-2-4.5(b), (g)(1). The Commissioner has discretion to certify a charitable bail organization if it: (1) is a business entity or nonprofit organization under the Internal Revenue Code or Indiana law; (2) is currently registered to do business in Indiana; (3) is located in Indiana; and (4) "exists for the purpose of depositing cash bail for an indigent defendant who: (A) is not charged with a crime of violence; or (B) if charged with a felony, does not have a prior conviction for a crime of violence." *Id.* § 27-10-2-4.5(b)(1)–(4). Once certified, charitable bail organizations are prohibited from paying bail for defendants who are either (1) charged with a crime of violence, or (2) charged with a felony and have a previous conviction for a crime of violence. *Id.* § 27-10-2-4.5(g)(2)(A)–(B). The law requires the Commissioner to "deny, suspend, revoke, or refuse to renew certification" for, among other things, "[a]ny cause for which issuance of the certification could have been refused had it then existed and been known to the commissioner." *Id.* § 27-10-2-4.5(f)(1).

D

Before HEA 1300 went into effect, The Bail Project sued the Commissioner in federal court, alleging that the law would violate its rights under the First Amendment's Free Speech

Clause and the Fourteenth Amendment's Equal Protection
Clause. The Bail Project moved for a preliminary injunction
under Federal Rule of Civil Procedure 65, seeking to enjoin
the Commissioner from enforcing HEA 1300 against it. The
district court concluded that The Bail Project had failed to
show a likelihood of success on the merits of either claim and
denied the motion.

## II

We review the district court's decision to deny a prelimi-
nary injunction for abuse of discretion. *Life Spine, Inc. v. Aegis
Spine, Inc.*, 8 F.4th 531, 539 (7th Cir. 2021). We review the dis-
trict court's factual findings for clear error, its legal conclu-
sions de novo, and its balancing of the factors for a prelimi-
nary injunction for abuse of discretion. *D.U. v. Rhoades*, 825
F.3d 331, 335 (7th Cir. 2016). An exercise of discretion based
on a legal error is an abuse of discretion. *Common Cause Ind. v.
Lawson*, 978 F.3d 1036, 1039 (7th Cir. 2020). But absent an error
of fact or law, we afford a district court's decision to grant or
deny an injunction "great deference." *Speech First, Inc. v.
Killeen*, 968 F.3d 628, 638 (7th Cir. 2020).

## A

A preliminary injunction provides an extraordinary form
of relief, available only when a party makes a clear showing
that the case demands it. See *Orr v. Shicker*, 953 F.3d 490, 501–
02 (7th Cir. 2020). "As a threshold matter, a party seeking a
preliminary injunction must demonstrate (1) some likelihood
of succeeding on the merits, and (2) that it has 'no adequate
remedy at law' and will suffer 'irreparable harm' if prelimi-
nary relief is denied." *Cassell v. Snyders*, 990 F.3d 539, 544–45
(7th Cir. 2021) (quoting *Abbott Lab'ys. v. Mead Johnson & Co.*,

971 F.2d 6, 11 (7th Cir. 1992)). If a plaintiff makes such a show-ing, the court then weighs the relative harm the parties will suffer with or without an injunction and considers whether an injunction is in the public interest. *Courthouse News Serv. v. Brown*, 908 F.3d 1063, 1068 (7th Cir. 2018). But if a party fails to show a likelihood of success on the merits, the court need not address the remaining preliminary injunction elements. See *Lukaszczyk v. Cook County*, 47 F.4th 587, 598 (7th Cir. 2022).

B

The First Amendment's Free Speech Clause, applicable to the states through the Fourteenth Amendment, extends to both "symbolic or expressive conduct as well as to actual speech." *Virginia v. Black*, 538 U.S. 343, 358 (2003); see also *Stromberg v. California*, 283 U.S. 359 (1931); *Gitlow v. New York*, 268 U.S. 652 (1925) (incorporating the First Amendment right to free speech against the states). But the First Amendment protects conduct only when it is "inherently expressive." *Rumsfeld v. F. for Acad. & Inst. Rts., Inc.*, 547 U.S. 47, 66 (2006). To be inherently expressive, "the conduct in question must comprehensively communicate its own message without ad-ditional speech." *Tagami v. City of Chicago*, 875 F.3d 375, 378 (7th Cir. 2017). That is, "the conduct *itself* must convey a mes-sage that can be readily 'understood by those who view[ ] it.'" *Id*. at 378 (alteration in original) (quoting *Texas v. Johnson*, 491 U.S. 397, 404 (1989)). Otherwise, "an apparently limitless va-riety of conduct [could] be labeled 'speech' whenever the per-son engaging in the conduct intends thereby to express an idea." *United States v. O'Brien*, 391 U.S. 367, 376 (1968). Exam-ples of inherently expressive conduct include burning the American flag at a protest, *Johnson*, 491 U.S. at 406, burning a cross, *Black*, 538 U.S. at 360–61, 363, saluting a flag (and

refusing to do so), *W. Va. Bd. of Educ. v. Barnette*, 319 U.S. 624, 632 (1943), wearing an armband to protest war, *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 505–506 (1969), displaying a flag opposing the government, *Stromberg*, 283 U.S. at 369–70, and nude dancing as entertainment, *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 565–66 (1991).

Conduct that does not convey a message without the aid of additional speech, however, receives no First Amendment protection. In *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47 (2006), the Supreme Court held that conduct aimed at expressing disagreement with a government policy was not entitled to First Amendment protection when the conduct itself failed to convey any message. *Id*. at 66. The Forum for Academic and Institutional Rights, an association of law schools and law faculties, restricted military recruiters' access at law schools to protest sexual orientation discrimination in the military under a now-repealed government policy commonly known as "Don't Ask, Don't Tell," 10 U.S.C. § 654, Repealed Pub. L. 111-321, § 2(f)(1)(A), Dec. 22, 2010, 124 Stat. 3516. Congress responded by passing the Solomon Amendment, 10 U.S.C. § 983, which denied federal funding to higher learning institutions if any part of the institution refused to give military recruiters the same access to campus as other recruiters. The Forum sought a preliminary injunction, arguing that the Solomon Amendment unconstitutionally forced law schools to either forgo exercising their First Amendment rights (to decide whether to accommodate a military recruiter's message) or risk losing federal funding for their entire universities. *Rumsfeld*, 547 U.S. at 66.

The Court held that the First Amendment did not apply to the Forum's conduct because the "conduct regulated by the

Solomon Amendment is not inherently expressive." *Id.* at 66. Although the "law schools 'expressed' their disagreement with the military by treating military recruiters differently from other recruiters[,]" that action was "expressive only because the law schools accompanied their conduct with speech explaining it." *Id.* The point of requiring military interviews to be conducted away from law schools, the Court reasoned, was not "overwhelmingly apparent[,]" and "[a]n observer who sees military recruiters interviewing away from the law school has no way of knowing whether the law school is expressing its disapproval of the military, all the law school's interview rooms are full, or the military recruiters decided for reasons of their own that they would rather interview someplace else." *Id.* The necessity of explanatory speech to convey a message, moreover, was "strong evidence that the conduct at issue … is not so inherently expressive that it warrants [First Amendment] protection[.]" *Id.* Combining speech and conduct is not enough, the Court said, because then "a regulated party could always transform conduct into 'speech' simply by talking about it." *Id.*

We applied *Rumsfeld* to assess another combination of speech and conduct in *Tagami v. City of Chicago*, 875 F.3d 375 (7th Cir. 2017). There, the plaintiff walked around Chicago naked from the waist up on "GoTopless Day" to protest laws that prevent women from doing so. *Id.* at 377. After she received a ticket for violating Chicago's public indecency ordinance, she sued the City, claiming that the ordinance violated the First Amendment. *Id*. We held that the ordinance regulated conduct that the First Amendment did not reach. *Id.* at 378. Regardless of the plaintiff's subjective intent, we concluded that her "public nudity did not *itself* communicate a message of political protest." *Id.* Although she went topless in

the context of a public protest while simultaneously express-ing views opposing the policy, we held that the conduct itself did not "comprehensively communicate its own message without additional speech." *Id.* While acknowledging that the First Amendment protects conduct when the "expressive, overtly political nature of th[e] conduct was both intentional and overwhelmingly apparent[,]'' *id.* (quoting *Johnson*, 491 U.S. at 406), we concluded that it was not "overwhelmingly apparent" to onlookers "that a woman's act of baring her breasts in public expresses a political message[,]" *id.*

C

Against this backdrop, we consider whether the First Amendment protects the payment of cash bail. The Bail Pro-ject argues that its payment of bail is inherently expressive conduct because (1) the organization intends to convey a mes-sage through bail payments, and (2) when viewed in context, a reasonable observer would understand its payment as com-municative. The Bail Project insists that even without knowledge of its mission, clerk's office employees and Indi-ana judges know that it is paying bail to express something.

In our view, The Bail Project's act of paying cash bail does not inherently express any message. On its own, paying bail for a pretrial defendant does not communicate even the most general version of The Bail Project's message—its opposition to cash bail. Without knowledge of The Bail Project's mission and repeat-player status, a reasonable observer would not un-derstand its payment of cash bail at the clerk's office as an ex-pression of any message about the bail system. A person could be paying bail to secure a loved one's freedom pending trial, or they could be performing a purely charitable act to help an indigent defendant. But whatever their motivation for

doing so, the point is that nothing about the act itself inherently expresses any view on the merits of the bail system. Because the conduct itself does not convey a message that "can be readily 'understood by those who view[ ] it,'" the First Amendment does not protect the conduct HEA 1300 regulates. *Tagami*, 875 F.3d at 378 (alteration in original) (quoting *Johnson*, 491 U.S. at 404).

The Bail Project says that its message comes through when coupled with speech explaining its efforts. The organization further argues that we must consider whether a reasonable observer who is aware of The Bail Project and knows its mission would perceive its payment of bail as expressive. But courts do not assume that an observer has foreknowledge of an actor's intentions when assessing whether conduct itself is intrinsically expressive. See *Rumsfeld*, 547 U.S. at 66. And here, without awareness of The Bail Project and its mission—presumably gleaned from the organization's website or other speech explaining its efforts—a reasonable person witnessing an employee from The Bail Project paying cash bail would not detect any message from the act itself. This further demonstrates that paying bail is not inherently expressive.

We do not doubt The Bail Project's intention to communicate its message through the payment of bail for clients. But subjective intent is not enough. See *O'Brien*, 391 U.S. at 376. Cash bail is a debated issue, and The Bail Project wishes to advance its position through both speech and action. Of course, the same was true of "Don't Ask, Don't Tell" and the Forum's efforts to protest the military. Yet the combination of speech and conduct aimed at protesting a particular policy does not trigger First Amendment protection for conduct that is not itself inherently expressive. That is why the First

Amendment provides no shield to the individual who intends to protest the IRS by refusing to pay his taxes, *Rumsfeld*, 547 U.S. at 66, nor does it allow a protestor to evade travel restrictions because he seeks to protest government action in a warzone, see *Clancy v. Off. of Foreign Assets Control of U.S. Dep't of Treasury*, 559 F.3d 595, 605 (7th Cir. 2009) (holding that that a person's travel to protest the Iraq War was not inherently expressive conduct). The throughline in all of these scenarios is that no reasonable observer could decipher a message from the conduct itself without some explanatory speech. So too here. The Bail Project's speech makes clear that its payment of bail is meant as an act of protest. But the payment of bail itself—like the displacement of military recruiters on campus, the refusal to pay taxes, or travel to a foreign war zone—does not communicate a message of protest.

We also reject the notion that Indiana's legislative response to The Bail Project's efforts suggests anything about the expressiveness of paying cash bail. The dissent views HEA 1300 as proof that the Indiana legislature was perhaps the most relevant observer of The Bail Project's conduct. That far-reaching view of a reasonable observer—to include legislative bodies not present when the conduct occurs but aware of it after-the-fact and in the aggregate—cannot be squared with *Rumsfeld*. Congress's legislative response neither made it an observer of the Forum's conduct nor factored into the Court's analysis of the conduct's expressiveness. So too here. Cf. *Int'l Ass'n of Fire Fighters, Loc. 365 v. City of East Chicago*, 56 F.4th 437, 454 (7th Cir. 2022) (Easterbrook, J., concurring) ("The Supreme Court has never held that a policy that harms the losers in a political contest can be enjoined as a penalty for speech.").

Because we conclude that the payment of cash bail is not entitled to First Amendment protection, we do not consider the parties' additional arguments regarding whether HEA 1300 survives intermediate or strict scrutiny, or whether it vests too much discretion in the Commissioner. The Bail Project has not shown a likelihood of success on the merits of its First Amendment claim, so we affirm the district court's denial of a preliminary injunction.

## III

Turning to the equal protection challenge, The Bail Project argues that HEA 1300 establishes two classes of bail payors: (1) charitable bail organizations, and (2) everyone else. The law prohibits only the former from paying bail for persons accused of crimes of violence or who are charged with felonies and have a past conviction for a crime of violence. The Bail Project contends that this distinction violates the Fourteenth Amendment because it does not rationally advance a legitimate government interest.

The parties agree that The Bail Project is not a member of a suspect class and no fundamental rights are at stake, so rational basis review applies. Our review is highly deferential—"it is enough for the state actor to show a rational basis for the classification." *Ostrowski v. Lake County*, 33 F.4th 960, 966 (7th Cir. 2022). Under rational basis review, a state policy "that treats two groups of people differently will pass muster so long as there is some rational relationship between the disparity of treatment and some legitimate governmental purpose." *Id.* (cleaned up). To succeed in challenging HEA 1300, The Bail Project "must 'negat[e] every conceivable basis' that might support the challenged law, and 'it is entirely irrelevant ... whether the conceived reason for the challenged distinction

actually motivated the legislature.'" *Monarch Beverage Co. v. Cook*, 861 F.3d 678, 681 (7th Cir. 2017) (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 314–15 (1993)).

The Bail Project has not shown that HEA 1300 is irrational. Indiana has a legitimate interest in regulating its pretrial detention and bail system, and HEA 1300's regulatory scheme is rationally related to that interest. The legislature could have determined that charitable bail organizations have different incentives, resources, and ties to the community than other bail payors, and therefore, that it was appropriate to treat them differently than bail payors who risk their own money and weigh their own safety to bail out a defendant. Perhaps this is bad policy, perhaps not. That is not for us to say. *Tully v. Okeson*, 977 F.3d 608, 616 (7th Cir. 2020) ("[R]ational-basis review is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." (citation and quotation marks omitted)). It is enough for us to determine that HEA 1300 is rationally related to Indiana's legitimate interest in administering its pretrial bail system.

As with the First Amendment claim, The Bail Project has failed to show a likelihood of success on the merits under the Equal Protection Clause. We therefore do not consider the remaining preliminary injunction elements. See *Doe v. Univ. of S. Ind.*, 43 F.4th 784, 791 (7th Cir. 2022).

IV

In sum, The Bail Project's payment of bail is not inherently expressive conduct, and the distinctions HEA 1300 draws between charitable bail organizations and other bail payors is rationally tied to Indiana's legitimate interest in regulating its pretrial detention system. Accordingly, The Bail Project has

not demonstrated a likelihood of success in its constitutional challenge to HEA 1300, and we affirm the district court's denial of a preliminary injunction.

AFFIRMED

JACKSON-AKIWUMI, *Circuit Judge*, dissenting. The First Amendment's protection of speech extends to conduct that is "inherently expressive." *Rumsfeld v. F. for Acad. & Inst. Rts., Inc.*, 547 U.S. 47, 66 (2006). *Texas v. Johnson*—the Supreme Court's landmark decision that held the First Amendment protects the act of burning an American flag during a protest—is a well-known case demonstrating the concept of inherently expressive conduct, and the majority opinion rightly cites to it. 491 U.S. 397, 406 (1989).

However, as *Texas v. Johnson* demonstrates, the Supreme Court decision that established the underlying test for analyzing whether conduct is "inherently expressive"—a phrase not coined until *Rumsfeld*—was *Spence v. State of Washington*, 418 U.S. 405 (1974). *Spence* held that, to determine whether conduct "possesses sufficient communicative elements to bring the First Amendment into play," courts must ask whether (1) "[a]n intent to convey a particularized message was present," and (2) "the likelihood was great that the message would be understood by those who viewed [the conduct]." *Johnson*, 491 U.S. at 404 (quoting *Spence*, 418 U.S. at 410–11).

These are the questions the majority opinion considers, ultimately answering no. *See supra* at 8–9, 11. But based on the facts before us, I reach the opposite legal conclusion: The Bail Project's conduct is indeed expressive because the organization intends to convey a particularized message (the parties do not dispute this), and not only was the likelihood great that those who viewed the conduct would understand that the organization intended to convey a message, the record shows that those who viewed the conduct *did* understand as much. I therefore respectfully dissent.

**I**

Context matters when evaluating whether conduct is protected by the First Amendment. In *Spence*, the Supreme Court held that the nature of a speaker's "activity, *combined with the factual context and environment in which it was undertaken,*" informs whether the speaker engaged in a type of protected expression. 418 U.S. at 410 (emphasis added). In short, context informs the answer to the two questions posed by the *Spence* test—was there an intent to convey a particularized message, and was the likelihood great the message would be understood by those who viewed the conduct? And a component of context is the relevant audience or observer—as *Spence* puts it, "those who viewed [the conduct]." *Id.* at 411.

*Spence* featured an appellant who flew the American flag upside down with a peace symbol affixed. The year was 1970, so the appellant's conduct "was roughly simultaneous with and concededly triggered by the Cambodian incursion and the Kent State tragedy," both, the Court said, "issues of great public moment." *Id.* at 410. When deciding the case four years later, the Court noted that if someone engaged in that same conduct today (as in 1974), it "might be interpreted as nothing more than bizarre behavior, but it would have been difficult for the great majority of citizens to miss the drift of appellant's point at the time that he made it." *Id.* The relevant audience— in Spence's case, citizens who the Court assumed had some understanding of current events during the early 1970s—was a part of the "factual context and environment" that informed the Court's decision about whether the appellant's activity was protected expression. *Id.*

Supreme Court cases both before and after *Spence* similarly demonstrate the importance of considering context,

including audience. In *Tinker v. Des Moines Independent Community School District*, students wore black armbands to school. 393 U.S. 503 (1969). In a silo, there is nothing inherently expressive about a strip of black cloth; it could represent a teen fashion choice or support for a sports team, for example. But in the context of *Tinker*, after the school principals "became aware of the [students'] plan to wear armbands" to protest the Vietnam War, they quickly adopted a policy prohibiting the conduct. *Id*. at 504. *Tinker* preceded *Spence* by five years but nonetheless implicitly illustrates how surrounding context—including the relevant audience—is crucial to the analysis of whether conduct is inherently expressive. The war coupled with the audience's awareness of the students' planned protest imbued the conduct with expressive elements.

The lesson that context, including audience, matters is also evident in *Texas v. Johnson*. The appellant burned an "American flag as part—indeed, as the culmination—of a political demonstration that coincided with the convening of the Republican Party and its renomination of Ronald Reagan for President." *Johnson*, 491 U.S. at 406. The Court did "not automatically conclude[] . . . that any action taken with respect to our flag is expressive;" rather, it found that the "expressive, overtly political nature of [the appellant's] conduct was . . . overwhelmingly apparent" because of the surrounding context described above. *Id*. at 405–06. Had the appellant hypothetically burned the American flag on a cold night in Central Park, a foreign tourist unfamiliar with the tradition of burning the American flag in protest could interpret the conduct as an effort to keep warm. The "context in which it occurred"—not the flag burning alone—made plain the political nature of the

appellant's conduct and led to First Amendment protection. *Id*. at 405.

A final example is *Virginia v. Black*, which offers an extensive history on cross burnings. The Court recognized that "a burning cross does not inevitably convey a message of intimidation." 538 U.S. 343, 357 (2003). In fact, the Court noted, from the Ku Klux Klan's founding in 1866 until approximately 1915, the group did not even use cross burnings to convey a message. *Id.* at 352–54. Since then, however, the group has used cross burnings "to communicate both threats of violence and messages of shared ideology" to the American people, who well understand the historical context for the Klan's conduct. *Id*. at 354.

In addition to *Virginia v. Black*, *Texas v. Johnson*, and *Tinker*, the majority opinion cites other examples of conduct the Supreme Court has recognized as inherently expressive. *See supra* at 8–9 (citing cases involving saluting or refusing to salute the flag, displaying a flag in opposition to the government, and nude dancing as entertainment). Each of these cases, even those that predate *Spence*, demonstrates the importance of analyzing context, including the relevant audience.

In short, any analysis of whether a message delivered through conduct alone would be understood "by those who viewed it" is incomplete if a court does not consider what *Spence* refers to as the "factual context and environment." 418 U.S. at 410. Decades of Supreme Court precedent shows that context is key, and audience matters.

## II

In my view, the majority opinion does not properly consider context and audience when asking whether observers of The Bail Project's conduct understand—without the assistance of explanatory speech—that a message is being conveyed.

The passage of House Enrolled Act 1300 confirms that the Indiana legislature was acutely aware of The Bail Project's conduct and concomitant advocacy. After all, neither party disputes that the law was enacted in direct response to the organization's efforts. *See supra* at 1–2, 5–6. The response was direct, and swift. As the majority opinion recounts, the legislature passed the law just four years after The Bail Project began operating in Indiana, by which time the organization had helped approximately 1,000 people in the state. *Supra* at 5. So when applying the *Spence* test, I see no reason to exclude the Indiana General Assembly from being characterized as an observer of The Bail Project's conduct, right alongside judges, prosecutors, criminal defense attorneys, jail administrators, and court employees who process bail payments, among other observers.

In fact, the Indiana General Assembly is arguably the *most* relevant audience in this context. The Bail Project wants to eliminate cash bail in Indiana, and it is the state legislators who have the power to do so.[1] The enactment of HEA 1300

---

[1] The majority opinion asserts that viewing the Indiana General Assembly as part of the relevant audience under the *Spence* test "cannot be squared with *Rumsfeld*." *Supra* at 13. But *Rumsfeld* does not say who can and cannot be considered an "observer," *Rumsfeld*, 547 U.S. at 66, or "reasonable onlooker," *Texas v. Johnson*, 491 U.S. at 409, under the *Spence* test. Rather, the Court in *Rumsfeld* identified the relevant audience in that case

itself supports a "likelihood," *Spence*, 418 U.S. at 411, that some type of message related to The Bail Project's conduct was conveyed to and received by the Indiana General Assembly. The fact that a receiver of the message reacted in a manner counter to that intended by the speaker (here, rather than eliminate cash bail for all, the legislature made it categorically unattainable for some) does not invalidate the expressive nature of the act.

One should rightly ask: Was explanatory speech necessary for the Indiana General Assembly to understand that The Bail Project's act of paying bail was communicative? Here, note that an observer need not understand the *exact* message, only that *some type of* message is being communicated: A "narrow, succinctly articulable message is not a condition of constitutional protection" for expressive conduct, for if it were, First Amendment protection "would never reach the unquestionably shielded painting of Jackson Pollock, music of Arnold Schoenberg, or Jabberwocky verse of Lewis Carroll." *Hurley v. Irish-Am. Gay. Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 569 (1995).

---

as "an observer who sees military recruiters interviewing away from the law school" without going into any additional detail about who else could be included in this category. 547 U.S. at 66.

The majority opinion's reliance on the concurrence in *International Association of Fire Fighters, Local 365 v. City of East Chicago*, 56 F.4th 437 (7th Cir. 2022), *see supra* at 13, is also puzzling given that the case does not involve expressive conduct or even whether a particular message is speech. The case addresses First Amendment retaliation—a separate test and analysis altogether that applies only to speech. It contains no discussion of who can be deemed an observer of conduct for purposes of the *Spence* test.

Based on this record, the answer is not complicated because we need only look at who the actor is: The Bail Project. It is no secret that an organization called The Bail Project is working on some type of project related to bail. Its mission is in the name and is relevant context for our analysis. *Cf. Nat'l Ass'n for the Advancement of Colored People v. Button*, 371 U.S. 415, 429–30 (1963) (pointing, as context, to the objectives of the NAACP in concluding that its litigation activity is a form of political expression protected by the First Amendment).

In deciding this question of whether explanatory speech was truly necessary, we cannot divorce conduct from context. If we do, then how can wearing a black armband, or burning a flag, or sitting at the front of a bus be deemed expressive conduct? It is context that turns these acts into a message—into a form of protest. And it is context that turns the ordinary act of paying cash bail into expressive conduct. Here we have (1) an organization *named* The Bail Project, (2) whose representatives pay cash bail for various defendants, (3) at a time when, as the majority opinion acknowledges, "[c]ash bail is a debated issue," *supra* at 12, and (4) the Indiana General Assembly, arguably the most relevant audience, has not only tuned into The Bail Project but also responded with pointed legislation to curb its activity. *Spence* requires us to analyze whether an "intent to convey a particularized message was present," and if in the "surrounding circumstances[,] the likelihood was great that the message would be understood by those who viewed it." *Spence*, 418 U.S. at 410–11. Under these circumstances, I do not see how The Bail Project's conveyance of a message through conduct could be any clearer.

One parting thought: Even if, as the majority insists, The Bail Project needed to use some explanatory speech to convey

its message, the Supreme Court in *Rumsfeld* held that the necessity of explanatory speech is "*strong evidence* that the conduct . . . is not so inherently expressive" as to warrant First Amendment protection. *Rumsfeld*, 547 U.S at 66 (emphasis added). The Court did not say it was *totally dispositive*.

### III

Analyzing the context surrounding conduct is crucial to determining whether that conduct is inherently expressive and therefore eligible for protection under the First Amendment. I believe the majority opinion's approach is too limited. When considering the context—including the relevant audience—of The Bail Project's actions, I see a high likelihood that those who observed the conduct understood that some type of message was being conveyed. I would remand to the district court for further proceedings on whether The Bail Project has a likelihood of success on the merits for preliminary injunction purposes. I respectfully dissent.